[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16850

_____

D.C. Docket No. 3:14-cv-00153-TCB

ANDREA GOGEL,

Plaintiff-Appellant,

versus

KIA MOTORS MANUFACTURING OF
GEORGIA, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(July 29, 2020)

Before WILLIAM PRYOR, Chief Judge, WILSON, MARTIN, JORDAN, ROSENBAUM, JILL PRYOR, BRANCH, GRANT, TJOFLAT,* ED CARNES,** MARCUS,*** and JULIE CARNES,**** Circuit Judges.*****

BRANCH, Circuit Judge, delivered the opinion of the Court, in which WILLIAM PRYOR, Chief Judge, GRANT, TJOFLAT, ED CARNES, MARCUS, and JULIE CARNES, Circuit Judges, joined.

WILLIAM PRYOR, Chief Judge, filed a concurring opinion.

JORDAN, Circuit Judge, filed an opinion concurring in the judgment.

WILSON, Circuit Judge, filed an opinion concurring in part and dissenting in part.

MARTIN, Circuit Judge, filed a dissenting opinion, in which ROSENBAUM and JILL PRYOR, Circuit Judges, joined.

ROSENBAUM, Circuit Judge, filed a dissenting opinion, in which MARTIN and JILL PRYOR, Circuit Judges, joined.

---

* We heard this case en banc while Judge Tjoflat was an active judge, and he elected to continue to participate in the decision of this case after becoming a senior circuit judge. *See* Eleventh Circuit Rule 35-9 ("Senior circuit judges of the Eleventh Circuit . . . may continue to participate in the decision of a case that was heard or reheard by the court en banc at a time when such judge was in regular active service.").

** We heard this case en banc while Judge Ed Carnes was an active judge, and he elected to continue to participate in the decision of this case after becoming a senior circuit judge. *See* Eleventh Circuit Rule 35-9 ("Senior circuit judges of the Eleventh Circuit . . . may continue to participate in the decision of a case that was heard or reheard by the court en banc at a time when such judge was in regular active service.").

*** We heard this case en banc while Judge Marcus was an active judge, and he elected to continue to participate in the decision of this case after becoming a senior circuit judge. *See* Eleventh Circuit Rule 35-9.

**** Senior Circuit Judge Julie Carnes elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

***** Judge Newsom is recused. Judge Robert J. Luck joined the Court on November 19, 2019 and did not participate in this decision. Similarly, Judge Barbara Lagoa joined the Court on December 6, 2019 and did not participate in this decision. Likewise, Judge Andrew Brasher joined the Court on June 30, 2020 and did not participate in this decision.

2

BRANCH, Circuit Judge:

After being fired by Kia Motors Manufacturing Georgia, Inc. ("Kia"), Andrea Gogel sued her former employer, asserting claims for gender and national-origin discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e-2(a) and 2000e-3(a), and 42 U.S.C. § 1981. The district court granted summary judgment in favor of Kia on all claims, and Gogel appealed to our court. A panel of this Court affirmed as to Gogel's discrimination claims,[1] but the majority opinion reversed the district court's grant of summary judgment as to Gogel's claim that Kia fired her in retaliation for her exercise of protected conduct. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 904 F.3d 1226 (11th Cir. 2018), *vacated*, 926 F.3d 1290 (11th Cir. 2019) (granting rehearing *en banc*). One member of the panel dissented as to the reversal of summary judgment in favor of Kia on Gogel's retaliation claim. *See Gogel*, 904 F.3d at 1239–48.

We granted rehearing *en banc* to consider whether the district court erred in granting summary judgment on Gogel's claim that she was fired in retaliation for

---

[1] Gogel alleged that she had been fired both because of her sex and national origin and in retaliation for protected activity. Concluding that there was no evidence that a discriminatory motive based on Gogel's sex or national origin led to her being fired, the panel opinion held that summary judgment was warranted as to any termination claim based on those grounds. *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 904 F.3d 1226, 1239 (11th Cir. 2018), *vacated*, 926 F.3d 1290 (11th Cir. 2019) (granting rehearing *en banc*). Gogel also alleged that Kia had discriminated against her based on her sex and national origin when it failed to characterize her Team Relations manager position as being Head of Department. The panel opinion concluded that Gogel abandoned this claim on appeal. *Id.* at 1233 n.3. We agree with and adopt both of these rulings by the panel.

engaging in protected conduct.  After careful review of the record and having the benefit of oral argument, we affirm the grant of summary judgment as to Gogel's retaliation claim under Title VII and § 1981.

## I.    BACKGROUND[2]

Formed in 2006 and located in the rural community of West Point, Georgia,[3] Kia is a subsidiary of the Korean Kia Motors Corporation, whose president and CEO at the time was Byung Mo Ahn.  Each department within the company had a Korean coordinator who worked in tandem with the American managers at Kia. The Korean coordinators were hired by the parent Kia company in South Korea and served three- to four-year assignments at the local Kia before being rotated out.  These Korean coordinators were heavily involved in decision-making at Kia.[4]

As for the American management, Randy Jackson, a white American male, was initially hired as the director of Human Resources and thereafter promoted to Senior Vice President of Human Resources and Administration.  In effect, Jackson

---

[2] Because we hear this appeal following a grant of summary judgment in favor of Kia, we take the facts of this case in the light most favorable to Gogel.  *Essex Ins. Co. v. Barrett Moving & Storage, Inc.*, 885 F.3d 1292, 1299 (11th Cir. 2018).

[3] West Point, Georgia is located 81 miles from Atlanta, 81 miles from Montgomery, Alabama, and 135 miles from Birmingham, Alabama.

[4] As will be discussed further in this opinion, because of the Korean coordinators' significant involvement in the decision-making at Kia, tensions developed as some American managers came to resent what they perceived as a lack of respect for and deference to the American managers' input.

was the chief administrative officer for Kia.  Human Resources was divided into two units: a unit that handled the administrative end of employee relations, such as hiring, background checks, and payroll (hereinafter "HR"), and the Team Relations unit, which handled virtually every other aspect of employee relations once an employee was on board, including the receipt of allegations by employees of harassment and discrimination, as well as the investigation of those allegations. Robert Tyler, a white American male, was selected as the manager of the HR department.  Gogel, a white American female, was hired in 2008 as Kia's Team Relations Department Manager, with three assistant managers who reported directly to her.  As the manager of Team Relations, she oversaw all of these investigations and reported back to Jackson with the results and her recommendations.

The events giving rise to the specific issue before us began during the tenure of an employee named Diana Ledbetter, a white American female hired in 2008 as a staff member of Kia's General Affairs department.  The General Affairs department was responsible for a variety of miscellaneous operational duties, including overseeing the cafeteria, office furniture, office supplies and machinery, and janitorial services.  The General Affairs department was also responsible for special events, including "celebration functions," "dinners or any kind of conferences or any kind of meetings," catering, flowers, and the like.  Ledbetter

5

had been hired as a General Affairs specialist and told that she would be responsible for "Protocol and Events." These events often involved visits by the Korean president of the company, Mr. Ahn, and other Korean officials. As to protocol, the events were designed to be consistent with the protocol followed for such dignitaries in Korea. And it was this protocol to which Ledbetter objected. Specifically, she was asked to pour wine for the Korean executives at these events and, upon their arrival at the plant, to hold flowers and say, "Welcome, Chairman." As a result, some unidentified co-workers teased her as being a "geisha."

Ledbetter disliked having to perform these duties. In addition, Ledbetter told Gogel that she believed that Ledbetter's supervisor, K.M.,[5] a black American female, was involved in a romantic relationship with President Ahn. This alleged relationship was of concern to Ledbetter because she believed this relationship enabled K.M. "to improperly use her position of manager to control subordinate employees" like Ledbetter. Ledbetter spoke to Gogel and others about this issue and requested that she be transferred away from K.M.'s supervision. Jackson agreed to transfer Ledbetter to Team Relations but told her that she had a better chance of a promotion if she stayed in General Affairs. Her dislike of working under K.M. notwithstanding, Ledbetter decided she would rather stay in General

---

[5] For purposes of this opinion, we refer to Ledbetter's supervisor by her initials "K.M."

Affairs with the prospect of a promotion.  In September 2010 she was designated the "acting" assistant manager of General Affairs.  Nonetheless, Ledbetter continued to ask Gogel to investigate what she believed to be an inappropriate relationship between K.M. and Ahn.

In fact, Gogel sought permission from Jackson in late 2008 to investigate the relationship between President Ahn and K.M. because of the possibility that K.M. might be "utilizing th[e] relationship to the detriment of others" and that K.M. might not have fully consented to the relationship.  Gogel was concerned about "the risk that [the relationship] could create for the company" and she wanted to investigate the issue to make sure that the company was not "at risk" from "people being treated in a way differently than they should be treated, from a legal and an ethical perspective."  Accordingly, she asked Jackson if she could conduct an investigation as to whether President Ahn and K.M. were having an affair. Jackson declined to authorize such an investigation.

Shortly thereafter, Kevin Kim, the Korean Coordinator for HR and Jackson's counterpart, asked Gogel to investigate K.M. secretly regarding her treatment of other team members and whether there was any "falsification of time" on her part, but he did not direct an investigation regarding President Ahn.  Kim directed Gogel not to reveal this investigation to Jackson.  Within a few weeks,

7

however, Kim asked Gogel to stop the investigation and to destroy any information she had gathered related to the investigation.

In March 2009, Jackson designated Tyler as the Head of Department ("HOD") over both Team Relations and HR and indicated that this new title was based on Tyler's years of experience and longevity with Kia. Given the significant responsibilities of her position, Gogel objected that she was not likewise designated as an HOD over Team Relations.[6]

After Gogel was not given a head of department designation in 2009, she met with Jackson and Tyler and informed them that she believed she did not receive the HOD title because of her gender and that there was a gender issue within the company. Indeed, as her complaint recounts, Gogel believed that the Korean management held antiquated views about the role of women in the workplace, generally, and that as to Gogel, specifically, she was not sufficiently listened to or respected by the Korean managers.

In August 2010, Jackson sent Gogel an email asking for her thoughts on how the Team Relations department could be improved. Gogel sent two lengthy emails in response that Jackson summarized as stating that "her department was being hampered by micro-management from people who did not understand the work

---

[6] This grievance constituted a substantial part of the basis for her claim of national origin and sex discrimination, which claim she has now abandoned on appeal.

being performed, did not respect her successes or the passion she brought to her job, and did not give her the freedom that she regarded 'as a basic aspect of being an American and working in an American environment.'"  Having received this and other input indicating that American managers felt they were not being given appropriate decision-making authority, Jackson asked Tyler to gather information as to the concerns of American management, including some specific factual examples.

Conferring with Gogel and some other members of American management, Tyler drafted and presented a lengthy Report of Concerns, setting out the American managers' unhappiness with the Korean managers and the lack of deference and respect they believed these managers showed their American counterparts.  This report was delivered to Jackson in late September 2010.  On October 12, 2010, Jackson attempted to speak to Gogel about the concerns expressed in the report, but she indicated her discomfort speaking to Jackson and instead indicated that she would prefer to talk to an independent or outside investigator.  A couple of days later, however, Gogel met with Jackson.  The meeting ended when Jackson had another appointment.  Thereafter, Gogel sent an email to Jackson, Tyler, Webb, and one of the Korean coordinators, explaining that Tyler had informed her that the matter was closed because "it was difficult to address issues that [Gogel] would not give information about."  Gogel expressed her disagreement with the

9

characterization that she was uncooperative and noted that Jackson was the one who ended the interview.  Further, she asserted that she told Jackson she would answer any questions he had, but he did not follow up with her.  Gogel requested an independent investigation into her concerns.

Thereafter, on November 10, 2010, Gogel filed her first charge with the Equal Employment Opportunity Commission ("EEOC"), alleging that she was not awarded an HOD designation due to gender and national origin discrimination. Kia received this charge on November 22, 2010.  On November 19, 2010, Tyler also filed a charge with the EEOC, alleging national origin discrimination and retaliation.

Given the sensitivity of Gogel's and Tyler's positions and their special access to the plant's entire workforce, Jackson and Kia general counsel Charles Webb requested on Friday, December 3, 2010, that Gogel and Tyler each sign an agreement to prevent any misuse of their positions in their continuing interactions with employees.[7]  As relevant to the present appeal, this agreement provided that

---

[7] Tyler signed the agreement on that same day, December 3.  Tyler nonetheless violated this agreement on two separate occasions, when he downloaded dozens of documents.  *See Tyler v. Kia Motors Mfg. Ga., Inc.*, 702 F. App'x 945, 948 (11th Cir. 2017); *Tyler v. Kia Motors Mfg. Ga., Inc.*, 2016 WL 9663168, at *8–9 (N.D. Ga. Aug. 1, 2016).  Learning of this conduct, Kia initiated an investigation into Tyler's computer activities and discovered that Tyler had forwarded hundreds of emails from Kia networks to his personal email accounts.  *Tyler*, 2016 WL 9663168, at *9.  Kia suspended Tyler and ultimately terminated him on January 6, 2011, stating in the termination letter that Kia "ha[d] lost confidence in [his] trustworthiness and

10

Gogel would neither "use [her] position to solicit or influence Team Members to make claims against [Kia]" nor would she "make any written or verbal statements to Team Members that malign the company."[8]

Expressing discomfort about signing the agreement until her lawyer could first review it, Gogel initially refused to sign the agreement and was placed on administrative leave. On Monday, December 6, 2010, which was the next business day, Gogel signed the agreement.[9] She was allowed to return to work that same day. On December 16, 2010, Gogel requested four additional days off (from

---

therefore, [Kia] ha[d] no alternative but to discharge [him] immediately." *Id.* (internal quotation marks omitted).

Tyler subsequently sued, alleging retaliatory termination in violation of Title VII and § 1981. The district court granted summary judgment to Kia. On appeal, we affirmed the grant of summary judgment, concluding that even though Tyler's filing of an EEOC charge constituted protected activity, his violation of the agreement constituted a neutral, non-retaliatory reason for terminating him, and that Tyler had failed to show that this ground was pretextual. *Tyler*, 702 F. App'x at 949–52.

[8] The agreement provided:

By signing below, I agree as follows:

A.  I will not discuss my EEOC charge or similar claims against [Kia] with Team Members and will not use my position to solicit or influence Team Members to make claims against [Kia];
B.  I will not put any Team Members, including my reports, in any conflict of interest by seeking their assistance in any fact finding or any information gathering related to my claim against [Kia];
C.  I will not make any written or verbal statements to Team Members that malign the company; and
D.  I will not seek access to any files or documents that relate in any way to the merits of my claim or similar claims against [Kia].

[9] We note that there is nothing in the record that indicates that Gogel contested any of the agreement's terms.

January 4, 2011 through January 7, 2011), which Jackson approved.  Then, on December 22, 2010, Kia gave Gogel a discretionary $12,000 bonus and Jackson, who handed her the check, told her she was doing a good job and shook her hand.

Things changed dramatically on December 23, however.  Unbeknownst to Jackson, on December 10, 2010, Diane Ledbetter had filed her own EEOC charge asserting a claim of discrimination based on her sex, national origin, and "Caucasian" race.  She also alleged the creation of a hostile work environment based on the job duties she was assigned, Kia's refusal to transfer her to her preferred department, Kia's refusal to investigate whether a co-worker had received a promotion because she was having a sexual relationship with a supervisor, and being told by some Korean managers that "good mothers stay at home and don't work."

On the afternoon of December 23, Jackson received written notice of Ledbetter's EEOC charge.  The charge itself indicated that it was faxed from the same law firm that Gogel and Tyler were using in the litigation of their own charges: an Atlanta law firm named Barrett & Farahany.  Jackson explained in his deposition that "it was very concerning" and "very puzzl[ing]" to him that Ledbetter happened to choose the "same law firm" as Gogel and Tyler.  Concerned that Gogel and Tyler were now "recruiting" other employees to sue the company, Jackson quickly emailed his Korean counterpart, Kim, to alert him and President

12

Ahn that it appeared that Gogel and Tyler were recruiting other employees to sue Kia. Jackson explained in his deposition that he was so shaken by the possibility that Gogel might be recruiting employees to sue Kia because, as Team Relations manager, Gogel was responsible for trying to resolve employee complaints internally, not to recruit employees to sue the company.

Immediately after Jackson received notification on December 23 of Ledbetter's EEOC charge, the Kia plant closed for the Christmas holidays. Thereafter, when the plant reopened during the first week of January 2011, and while Gogel was still on vacation, one of Gogel's subordinates, Arthur Williams, approached Jackson and general counsel Webb and expressed concerns regarding the conduct of Gogel and Tyler. Williams, a black American male, was one of three assistant managers working under Gogel in the Team Relations department, and he enjoyed a friendly relationship with Ledbetter. According to Williams, during October or November 2010 he noticed that Gogel and Ledbetter were meeting at various times. Then, at some point in November, Ledbetter confided in Williams that she, Gogel, and Tyler were planning to sue the company and were all working with the same attorney to do so.

After this revelation by Ledbetter, Williams began "paying close attention" and observed frequent meetings between Gogel and Ledbetter, as well as three to five meetings between Gogel, Ledbetter, and Tyler. Sometimes the meetings

13

between Gogel and Ledbetter would last from morning until lunch, and after the weekly Friday afternoon meetings, Gogel and Ledbetter would sometimes stay behind, continuing to meet privately even as Williams left for the evening between 5 and 6 p.m. All the while, Ledbetter kept telling Williams that she, Gogel, and Tyler were going to sue and use the same attorney. Further, Ledbetter indicated to Williams that Gogel was the ringleader and the catalyst for the trio's decision to take legal action. All of these developments were startling to Williams because Gogel's and Tyler's conduct was so at odds with the mission of the Team Relations department to try to "keep lawsuits from happening," not to instigate them.

Williams conveyed the above information to Jackson and Webb when he met with them in January. In short, Jackson learned from Williams that Gogel and Tyler were frequently meeting with and actively encouraging Ledbetter to sue Kia, that they were coordinating through the use of the same lawyer, and that Gogel was the leader of these endeavors.[10] Jackson likewise thought it "very strange" that Gogel and Ledbetter had been engaging in such frequent meetings. Williams

---

[10] When asked in his deposition whether he had indicated to Jackson and Webb that Gogel was the leader, Williams responded to the effect that that he had just "repeated [] what Diana [Ledbetter] told me" and that what Ledbetter "was telling" Williams was that "they were all filing and they all had the same attorney" and that Gogel was the "leader." Williams understood Gogel to be the "catalyst" for the bringing of the EEOC charges because Ledbetter had led him to believe that Gogel was the "ringleader."

further informed Jackson that Gogel exhibited a strong animus against the Korean management team and that she "hated the Koreans."

In addition, another assistant Team Relations manager, Paul Grimes, a black American male, also met with Jackson during this same period of time, and he corroborated some of the information provided by Williams. Grimes confirmed that Williams told him that Ledbetter, Gogel, and Tyler were going to sue the company and that they were trying to "persuade" Ledbetter to "join them in suing" Kia. Like Williams, Grimes was incredulous that Gogel and Tyler would behave in this way, but he nonetheless started "paying attention," and noticed "suspicious meetings behind closed doors." He informed Jackson and Webb that "the entire [Team Relations] department was wondering what was occurring with Diana [Ledbetter] meeting with Andrea [Gogel] for such long periods of time" and that "[t]hey would meet as often as three times a week and for several hours." Further, "[a]s [the] time approached when they filed their charges," Gogel, Tyler, and Ledbetter "were meeting nearly every day . . . for 1-1.5 hours."[11]

Having received the above information from Williams and Grimes, on January 7, 2011, Jackson and Webb called Gogel in for a meeting. They began by stating that Webb needed information concerning Ledbetter in order to respond to

---

[11] Ledbetter disputes some of the statements attributed to her and Gogel disputes the accuracy of some of Williams' and Grimes' testimony. See *infra* at 54 n.24. We discuss those disputes and the extent to which they are relevant to our ultimate decision later in this opinion.

15

the latter's recent EEOC charge.  During this meeting, they inquired whether

Gogel had "colluded" with Ledbetter and whether she had violated the December

6 agreement.  The discussion focused on Gogel's relationship with Ledbetter,

meetings she had with Ledbetter, and what her conversations had been with

Ledbetter.  Gogel denied having any significant interactions with Ledbetter,

explaining that her recent meetings had concerned only trivial operational

issues.[12]

Jackson placed Gogel on administrative leave following the January 7, 2011

meeting and ultimately terminated her employment on January 19, stating in his

deposition, "I was totally convinced that [Gogel] had solicited and encouraged

other team members to file a lawsuit against the company.  I had lost total

confidence and trust in her to perform her jobs, her job duties that she was hired to

do, and I could not continue her employment with Kia."  The formal termination

letter provided as follows:

> As you know, your position as Manager of Team Relations in
> Human Resources is critically important to [Kia].  One of your
> primary duties is to investigate potential discrimination or harassment
> claims, either personally or by directly supervising those conducting
> the investigations, in order to protect [Kia] by taking prompt action
> when warranted.  You and [Kia] previously recognized the potential
> for conflict of interest in the discharge of your duties, and on

---

[12] During this litigation, however, Gogel admitted to telling Ledbetter that she did not trust the people at Kia "to listen to or deal with any concerns" and that Gogel was planning "to seek outside assistance" regarding her own complaints against Kia.  Gogel also concedes that she provided Ledbetter with the name of the attorney with whom Gogel had chosen to meet.

16

December 6, 2010, you signed the attached [agreement]. In this document you agreed that you would not solicit or influence team members to make claims against [Kia], you would not put any team members in a conflict of interest, you would not make any written or verbal statements to team members that malign the company, and that you would not seek to access files or documents that relate in any way to the merits of your claims.

As we discussed on January 7, 2011, Diana Ledbetter filed a cha[r]ge of discrimination against [Kia] on December 10, 2010. Part of this charge alludes to claims that [Kia], including Human Resources, did not properly investigate her complaints against [Kia]. In investigating this charge, [Kia] received credible reports that [Ledbetter] discussed her intent to file a claim with you in advance of doing so, that you did not attempt to encourage [her] to internalize the complaint (rather than to externalize the complaint), and that you did not notify [Kia] about the likely filing of a charge by another individual. You were seen by multiple people having numerous, lengthy private conferences with Ms. Ledbetter during the last two-three months, yet you denied having any significant recent interaction with her. Based on our investigation, one could conclude that you encouraged or even solicited the filing of the charge. At the very least, there is an appearance of a conflict of interest sufficient to cause [Kia] to lose confidence in the loyalty and trust that is required by your position.

Also, since your administrative leave began, we have received additional reports from within your department and elsewhere which caused [Kia] to lose faith in you as a manager. Team Members fear retaliation from you, find inappropriate your stated and demonstrated personal dislike for many of the managers at [Kia], and are concerned by your demonstrated animus toward the Korean culture at [Kia]. Finally, some of the Team Members you supervise perceive that you do not support [Kia's] positive conciliatory approach to dealing with issues, but instead prefer a combative win-lose approach which often escalates issues unnecessarily.

Therefore, [Kia] has no alternative but to discharge you immediately.

17

Following her termination, Gogel filed a second EEOC charge in which she alleged retaliation by Kia. Specifically, Gogel stated that she had been discharged, that Kia said it had discharged her for encouraging another employee to file a charge of discrimination with the EEOC, and that she believed she had been retaliated against due to her opposition to unlawful acts under Title VII. Kia subsequently filed its position statement with the EEOC regarding the second charge, explaining that Gogel "was responsible for conducting and overseeing investigations, administering corrective action, and evaluating and improving team member morale. . . . [Gogel] was also responsible for investigating and correcting any and all complaints of harassment and discrimination in the workplace." Kia explained that after receiving notice of Gogel's first EEOC charge, it had her sign the December 6 agreement "[i]n an attempt to protect [Kia's] team members and proprietary information." Thereafter, upon receiving Ledbetter's EEOC charge and conducting an investigation, Kia discovered from other employees that Ledbetter and Gogel had met several times, yet Gogel denied these interactions when questioned. Further, Kia noted that "there were no reports of discrimination documented or investigations opened regarding Ledbetter during the time period in question. [Gogel] did not attempt to defuse the situation or handle it in any manner in which she was employed to do." Moreover, "after the meetings with [Gogel],

18

Ledbetter contacted [Gogel's] attorney for representation purposes." Finally, Kia

noted that:

> [i]t became obvious to [Kia] that [Gogel] was blatantly dishonest when explicitly questioned about Diana Ledbetter. Further, she did not perform her job, but instead encouraged a team member to sue [Kia] and seek outside counsel to deal with her discrimination charge instead of handling it in-house. This was clearly a breach of trust, a conflict of interest, and a blatant failure to perform her job duties. Accordingly, [Gogel] was terminated on January 19, 2011.

After receiving a right to sue notice from the EEOC, Gogel filed the

underlying action. In her amended complaint, Gogel alleged in relevant part that

Kia terminated her in retaliation for her filing of the first EEOC charge. The

parties filed cross-motions for summary judgment, and the district court denied

Gogel's motion and granted Kia's motion. With regard to the retaliation claim, the

district court concluded that Kia did not fire Gogel in retaliation for conduct

protected by Title VII, but instead fired her for a legitimate reason: solicitation of a

subordinate to file an EEOC charge against Kia, in contravention of her job

responsibilities. Gogel appealed, contending that the district court erred in

granting summary judgment for two main reasons: (A) there is a triable issue of

fact as to whether the real reason Kia fired Gogel was because she had filed her

own EEOC charge, not because she solicited another employee to sue the

company, and (B) Kia's stated reason for terminating Gogel's employment—

19

Gogel's alleged solicitation of Ledbetter—was itself protected conduct under Title VII's opposition clause and could not justify Gogel's termination.

## II.     STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*, "view[ing] the evidence in the light most favorable to the non-moving party." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007). Although "questions of fact in job discrimination cases are 'both sensitive and difficult' and '[t]here will seldom be "eyewitness" testimony as to the employer's mental processes,' . . . 'none of this means that trial courts or reviewing courts should treat discrimination differently from other ultimate questions of fact." *Chapman v. AI Transp.*, 229 F.3d 1012, 1026 (11th Cir. 2000) (*en banc*) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)) (first alteration in original). In other words, "the summary judgment rule applies in job discrimination cases just as in other cases." *Id.* Summary judgment is proper if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Further, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could

20

not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968))).

## III.  DISCUSSION

Title VII prohibits an employer from retaliating against "any . . . employee[] . . . because [s]he has opposed any practice made an unlawful employment practice" by Title VII, "or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a).  The first part of the anti-retaliation provision is known as the "opposition clause" and the second part as the "participation clause." *See E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 (11th Cir. 2000).  Retaliation claims are also cognizable under 42 U.S.C. § 1981 and are analyzed under the same framework as Title VII claims. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 452–57 (2008); *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).

To make a *prima facie* case for a claim of retaliation under Title VII, a plaintiff must first show (1) that "she engaged in statutorily protected activity," (2) that "she suffered an adverse action," and (3) "that the adverse action was causally related to the protected activity." *Jefferson v. Sewon Am., Inc.*, 891 F.3d

21

911, 924 (11th Cir. 2018); *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th Cir. 2009).

Once the *prima facie* case is established, it creates a "presumption that the adverse action was the product of an intent to retaliate." *Bryant*, 575 F.3d at 1308. The burden of production then shifts to the employer to rebut the presumption by articulating a legitimate, non-discriminatory reason for the employment action. *Id.* If the employer produces such a reason, the presumption is rebutted, and the plaintiff must then demonstrate that the "proffered reason was merely a pretext to mask [retaliatory] actions." *Id.* To establish the necessary causation, a plaintiff must demonstrate that "her protected activity was a but-for cause of the alleged adverse action by the employer." *Univ. of Tx. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013). In other words, "a plaintiff must prove that had she not [engaged in the protected conduct], she would not have been fired." *Jefferson*, 891 F.3d at 924. "Importantly, throughout this entire process, the ultimate burden of persuasion remains on the employee." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1333 (11th Cir. 2013).

## A. Summary Judgment is Warranted on Gogel's Retaliation Claim Alleging that She Was Fired Because She Filed An EEOC Charge

In support of her retaliation claim, Gogel contends that the real reason Kia fired her was because she had filed an EEOC charge—which is clearly protected conduct under Title VII's participation clause—not because she solicited another

22

employee to sue the company.  In other words, Gogel argues that Kia's stated reason for her termination—her recruitment of a subordinate to sue the company—is a pretext intended to mask its true reason for taking this action.  This argument is without merit.

Kia concedes, and we will likewise assume,  that Gogel established a *prima facie* case as to her retaliation claim based on her filing of the first EEOC charge. Specifically, (1) the filing of her first EEOC charge constituted protected conduct; (2) thereafter, Gogel was fired; and (3) there was a causal connection between the two events sufficient to withstand the requirements for making a *prima facie* case, which has traditionally required a showing "that the protected activity and the adverse action were not wholly unrelated."[13]  *Goldsmith v. Bagby Elevator Co.*,

---

[13]  As noted, for purposes of proving causality in a Title VII retaliation claim, the Supreme Court in *Nassar* held that a plaintiff must prove that *but for* the protected conduct, the defendant would not have taken the particular adverse action.  We and other circuit courts have integrated this but-for standard into our summary judgment analysis.  *See Knox v. Roper Pump Co.*, 957 F.3d 1237, 1245 (11th Cir. 2020);  *Jefferson*, 891 F.3d at 924; *cf. Nesbitt v. Candler Cty.*, 945 F.3d 1355, 1359 (11th Cir. 2020) (applying the "but for" test  to a summary judgment decision involving the antiretaliation provision of the False Claims Act).

Circuit courts, however, have been inconsistent on the question whether *Nassar*'s but-for causation standard applies at the *prima facie* stage of the summary judgment analysis or whether it is at the pretext stage of the analysis when the plaintiff must satisfy this standard.  *Compare Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 252 (4th Cir. 2015) (a plaintiff must show at the pretext stage "that retaliation was the real reason for the adverse employment action" and that the adverse action "would not have occurred in the absence of—that is, but for—the defendant's conduct." (alteration adopted) (internal quotation marks omitted)); *Garcia v. Prof. Contract Serv., Inc.*, 938 F.3d 236, 243 (5th Cir. 2019) (a plaintiff must satisfy the *Nassar* but-for test at the pretext stage of the analysis); *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 258–59 (3d Cir. 2017) (likewise requiring the plaintiff to satisfy the but-for test at the pretext stage of the analysis) *with Mollet v. City of Greenfield*, 926 F.3d 894, 896–97 (7th Cir. 2019) (applying the *Nassar* but-for test at the *prima facie* stage); *Bekkem v. Wilkie*, 915 F.3d 1258, 1271 (10th Cir.

23

513 F.3d 1261, 1277–78 (11th Cir. 2008) (quoting *Simmons v. Camden Cty. Bd. of Educ.*, 757 F.2d 1187, 1189 (11th Cir. 1985)). The burden of production then shifted to Kia to articulate a legitimate, non-retaliatory reason for firing Gogel. Kia articulated such a reason.  Specifically, Kia explained that it fired Gogel not because she filed an EEOC charge, but because she had recruited another employee to sue the company, which conduct Kia believed to have rendered Gogel ineffective in her position as Team Relations manager.[14]  Thus, Kia rebutted the presumption, arising from Gogel's *prima facie* showing, that the adverse action was the product of an intent to retaliate.  *Bryant*, 575 F.3d at 1308.

Therefore, to defeat summary judgment, Gogel had to demonstrate that Kia's proffered reason for its decision—Gogel's solicitation of Ledbetter to sue Kia—was merely a pretext to mask its real reason—Gogel's filing of an EEOC charge—and that but for this latter action Kia would not have fired her.  We have

2019) (same); *Redlin v. Grosse Point Pub. Sch. Sys.*, 921 F.3d 599, 614–15 (6th Cir. 2019)(implying that the *Nassar* test applies at the *prima facie* stage).

In *Jefferson*, we did not squarely address whether the but-for test should apply at the *prima facie* or pretext stage of analysis, but we did remark that, in the summary judgment context, the question was whether a reasonable jury could find that the employer's "explanation was pretextual and that [the plaintiff's] complaint was the 'but-for cause' of her termination." *Jefferson*, 891 F.3d at 925.  In *Roper*, we also applied *Nassar*'s but-for standard when discussing whether a reasonable jury could find that the plaintiff was terminated based on his protected activity, a question that arises during the pretext stage of analysis.  *Roper*, 957 F.3d at 1245–46. Likewise, we will assume here that the but-for test is to be applied at the pretext stage of the summary judgment examination, and our analysis so proceeds under this assumption.

[14] We address in subsection B Gogel's contention that her alleged recruitment of Ledbetter was itself protected conduct under Title VII and therefore could not justify her termination.

24

repeatedly emphasized that "[p]rovided . . . the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it . . . ." *Chapman*, 229 F.3d at 1030; *see also Hornsby-Culpepper v. Ware*, 906 F.3d 1302, 1312 (11th Cir. 2018); *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 892–93 (11th Cir. 2011); *Alvarez v. Royal Atl. Dev., Inc.*, 610 F.3d 1253, 1265–66 (11th Cir. 2010); *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1088 (11th Cir. 2004). Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir. 2005) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)). "[A] reason is not pretext for [retaliation] 'unless it is shown *both* that the reason was false, *and* that [retaliation] was the real reason.'" *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007) (quoting *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d 1160, 1163 (11th Cir. 2006)). And to repeat, in determining whether the plaintiff has met her burden to show pretext, we remain mindful that it is the plaintiff's burden to provide evidence from which one could reasonably conclude that but for her alleged protected act, her employer would not have fired her.

Gogel has not shown "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Kia's stated reason for discharging her—her solicitation of another employee to sue the company—sufficient to provide a legitimate ground for a reasonable factfinder to find that explanation to be unworthy of credence.  In short, she has failed to provide evidence showing that but for her filing of an EEOC charge, Kia would not have fired her.  As noted, Kia did not fire Gogel upon receiving notice of her EEOC charge on November 22, 2010.  To the contrary, Kia granted her request for additional vacation time, awarded her a $12,000 discretionary bonus, and Jackson advised Gogel that she was doing a good job.  It was only when Kia later learned—46 days after it had received her EEOC charge[15]—that Gogel had recruited a subordinate to sue the company that Kia concluded Gogel could no longer function in her highly sensitive position as manager of Team Relations and that she must therefore be discharged.

---

[15] Gogel and our dissenting colleagues, Judges Martin and Wilson, argue that evidence of pretext is present because her termination in January 2011 was in close temporal proximity to the filing of her own November 2010 EEOC charge.  While close temporal proximity between the protected conduct and the adverse employment action can establish pretext when coupled with other evidence, temporal proximity alone is insufficient.  *See Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1328 (11th Cir. 2020) (temporal proximity of less than two months was insufficient by itself to establish pretext); *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (the close temporal proximity of two weeks was evidence of pretext but "probably insufficient to establish pretext by itself"); *Wascura v. City of South Miami*, 257 F.3d 1238, 1244–45 (11th Cir. 2001) (a three and one-half month period between the employee's protected conduct and her termination was, standing alone, insufficient to demonstrate pretext).  And here, an intervening event—Kia's discovery of information indicating that Gogel had solicited Ledbetter to sue and had provided her with the name of an attorney to use—undermined the significance of any temporal proximity.

Gogel is necessarily arguing that if she had recruited Ledbetter to sue the company

and referred her to an attorney, but had never filed her own EEOC charge, Kia

would not have fired her.  Yet, there is no evidence[16] to reasonably support an

inference that Kia would have fired Gogel following the filing of Gogel's charge

had the Ledbetter matter not later come to its attention.[17]  In fact, all the record

[16] In support of their argument that a reasonable jury could have concluded that Gogel's filing of the first EEOC charge was the "but-for" cause of Kia's decision to fire her, our dissenting colleagues cite to evidence they say shows that Robert Tyler was likewise retaliated against when he was fired after he filed his EEOC Charge.  In other words, they argue that because Kia engaged in similar retaliation toward another employee who filed an EEOC charge, Gogel has bolstered her claim that she too was fired because she had filed a charge.

At least one problem with this argument is the fact that our Court has reviewed Tyler's retaliation claim and concluded that Kia did not retaliate against Tyler based on his filing of a charge.  Specifically, Kia was granted summary judgment on Tyler's claim of retaliatory termination, and we affirmed that grant on appeal.  *See Tyler*, 702 F. App'x at 952.  In affirming, we noted that Kia had stated that it fired Tyler because he improperly downloaded confidential files to his personal computer in violation of both company policy and the conflict of interest agreement he entered after filing his EEOC charge.  *Id.* at 951.  We concluded that Tyler had not "provide[d] any evidence demonstrating 'weaknesses, implausibilities, or inconsistencies'" in Kia's proffered justification sufficient to show that Kia's non-retaliatory reasons for firing him were pretextual.  *Id.*  While *Tyler*, which involves a different plaintiff, does not represent the law of the case, its reasoning nonetheless applies equally to Gogel's claim of pretext, which we likewise find to be unsupported by the evidence.

Similarly, Ledbetter's assertion that, after Gogel's termination, she felt pressured to drop her own EEOC charge and to acknowledge that Gogel had played a role in her decision to file an EEOC charge does not suggest a weakness, implausibility, or inconsistency in Kia's explanation that it fired Gogel, not because Gogel had filed an EEOC charge, but because Gogel had acted in contradiction of Kia's core expectations for a person in her position.  *See id.*

[17]  Indeed, our dissenting colleague, Judge Martin, earlier appeared to share this view in her  majority panel opinion (now vacated) when, in rejecting Gogel's claim that she was terminated because of her gender and national origin, she stated, "Rather, the record strongly indicates that Kia fired Ms. Gogel for assisting Ms. Ledbetter with her charge."  *Gogel*, 904 F.3d at 1239.  As to the majority panel opinion's discussion of the retaliation claim, Gogel's filing of the first EEOC charge was apparently deemed so unlikely a candidate for the protected activity retaliated against that the majority panel opinion never even mentioned it as a possible basis for the retaliation claim.  Instead, the majority panel opinion focused solely on whether Gogel's alleged solicitation of another employee to sue constituted protected activity, concluding that

27

evidence pointed to the continuation of the employment relationship between Gogel and Kia after Gogel filed her charge. Conversely, had Gogel only recruited Ledbetter to sue the company, providing her with the name of an attorney to use in this endeavor—but never filed her own EEOC charge[18]—nothing in the record supports an inference that Kia would have tolerated such conduct from its Team Relations manager. See discussion *infra* in subsection B. In short, having failed to demonstrate that Kia's stated reason for firing her was a pretext to mask a retaliatory motive, Gogel has necessarily failed to show that a reasonable jury could find that but for the filing of her EEOC charge she would not have been fired.

---

"Viewing the evidence in the light most favorable to Ms. Gogel, the record shows that Kia fired her for engaging in protected opposition activity, which she carried out in a reasonable manner." *Gogel*, 904 F.3d at 1238.

[18] Our dissenting colleague, Judge Rosenbaum, faults us for limiting ourselves to consideration of Gogel's filing of the first EEOC Charge and for failing to consider whether one could infer that Kia fired Gogel because of her prior complaints concerning perceived mistreatment of herself and others. Although Gogel has certainly provided in great detail her version of her interactions with Kia, including internal complaints she made during her employment, she has focused on the filing of her first EEOC charge, which charge claimed discrimination based on Kia's refusal to designate her position as an HOD, as the primary event triggering Kia's decision to fire her. At any rate, consideration of any prior incidents between Gogel and Kia—many of them occurring long before Gogel ever filed a charge—does not change the above analysis. Despite Gogel's earlier internal complaints while employed with Kia, Kia fired her only when it became aware of facts suggesting that she had recruited Ledbetter to sue the company. There is no evidence to suggest that Kia would have allowed Gogel to remain as Team Manager once Kia received information that Gogel had solicited a subordinate to sue the company and had provided that employee with the name of a lawyer to use— regardless of whether or not Gogel had previously complained internally. Thus, this "prior complaints" evidence does not satisfy Gogel's burden to demonstrate pretext or otherwise provide evidence from which one could reasonably infer that but for these prior complaints, Kia would not have fired her.

28

**B.** **Gogel's Solicitation of Ledbetter Did Not Constitute Protected Activity**

Alternatively, Gogel argues that her termination violates Title VII and § 1981 because, even assuming *arguendo* that she recruited Ledbetter to sue the company, as Kia came to believe, such conduct is itself protected activity under the opposition clause and, therefore, it could not provide Kia with a legitimate, nonretaliatory reason for her termination. In response, Kia contends that by attempting to recruit another employee to sue Kia, Gogel's action so conflicted with her responsibilities as Team Relations manager that it cannot be considered to constitute protected activity. Because the parties have assumed that Kia's stated reason for firing Gogel cannot rebut her *prima facie* case of retaliation under the participation clause if that reason would violate the opposition clause, we assume that premise without deciding the question.

1. Legal Framework

The question then is whether, in light of her responsibilities in the Team Relations Department, Gogel's recruitment of a subordinate to sue the company constituted conduct protected against retaliation under the opposition clause. Our precedent provides a ready answer: when the means by which an employee expresses her opposition "so interferes with the performance" of her job duties "that it renders [her] ineffective in the position for which [she] was employed," this oppositional conduct is not protected under Title VII's opposition clause. *Rosser*

29

*v. Laborers' Int'l Union of N. Am.*, *Local No. 438*, 616 F.2d 221, 223 (5th Cir. 1980). And here, Gogel's efforts to recruit an employee to sue the company so clearly conflicted with the performance of her job duties as the manager of the Team Relations department that it rendered her ineffective in that position and reasonably prompted Kia to conclude that it could no longer trust her to do the job for which she was being paid.

"[I]t is well established that the protection afforded by [Title VII's opposition clause] is not absolute." *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 400–01 (11th Cir. 1989). To qualify for protection under the opposition clause, "the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable." *Id.* at 401. When examining the reasonableness of the manner of an employee's conduct, we "balanc[e] the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Id.*

In fact, since *Rosser*, we have repeatedly recognized that some otherwise protected oppositional conduct can fall outside Title VII's protection if the conduct so interferes with an employee's performance of her job duties that it renders her ineffective in the position in which she is employed. For instance, in *Hamm v. Members of the Board of Regents of the State of Florida*, 708 F.2d 647, 654 (11th

30

Cir. 1983), we affirmed the dismissal of a Title VII retaliation claim for failing to state a *prima facie* case, holding that the plaintiff failed to show protected activity because the plaintiff's activities in opposition to alleged discrimination conflicted with the plaintiff's essential duties as a human resources advisor. Specifically, Hamm's "duties included investigating instances of alleged discrimination, filing written reports of her findings with the appropriate supervisory personnel, and recommending appropriate action for their final approval or disapproval." *Id.* The record showed, however, that rather than follow her employer's established procedures for resolving discrimination complaints, the employee consistently acted as an advocate on behalf of aggrieved employees. *Id.* at 653–54. We concluded that her actions were not protected under Title VII because she "repeatedly chose to work outside the framework [her employer] was attempting to establish to deal with discrimination claims. [And] [a]n employer may remove an employee from a position similar to that at issue here without violating Title VII based on the manner in which the employee undertakes his or her duties." *Id.* at 654.

Similarly, in *Whatley v. Metropolitan Atlanta Rapid Transit Authority ("MARTA")*, 632 F.2d 1325, 1326 (5th Cir. 1980), the plaintiff, an Equal Employment Opportunity compliance officer for MARTA, alleged that he was retaliated against when he was terminated after engaging in protected conduct by

31

filing a formal discrimination complaint on behalf of another employee. On appeal, we affirmed the denial of his retaliation claim, concluding that the plaintiff was not fired because he had participated in a statutorily protected activity (filing the complaint). *Id.* at 1329. Instead, he was fired because he had violated the company's normal reporting procedures and assumed a role that conflicted with his job responsibilities. *Id.* In so holding, we emphasized that "[f]ailing to follow prescribed administrative procedures is not a statutorily protected activity. Title VII cannot be held to immunize an employee from all consequences of his behavior merely because part of his job happens to require the handling of discrimination complaints." *Id.*

Additionally, in *Jones v. Flagship International*, 793 F.2d 714, 716 (5th Cir. 1986), the plaintiff was in-house legal counsel and the Manager of Equal Employment Opportunity Programs for her employer, and her duties included investigating charges of discrimination brought against the company, conciliating such charges, representing the company before various agencies, and preparing an affirmative action plan. At some point, the plaintiff experienced sexual harassment in the workplace and complained to her superiors, but her grievances were ignored. *Id.* at 716–17. She then filed a charge with the EEOC alleging pay discrimination and sexual harassment. *Id.* at 717. Upon learning of her charge, her employer suspended her with pay. *Id.* Following her suspension, Jones's employer received

32

information that Jones also solicited another employee to file a discrimination charge against the company and invited another employee to join in a lawsuit against the company. *Id.* Jones was later fired, and she brought a retaliation claim. *Id.* at 717–18. Discussing the impact of Jones's solicitation of another employee to sue the company, the Fifth Circuit cited *Rosser* for the proposition that even sincere opposition to discriminatory practices under Title VII "may be so disruptive or inappropriate as to fall outside the protections of § 704(a)." *Id.* at 728. The court agreed that an employer's right to run its business must be balanced against the rights of an employee to express her grievances and promote her own welfare. *Id.* However, the court noted that the plaintiff's "right to express her grievances and promote her own welfare did not depend on others joining in her suit." *Id.* Thus, applying the above tests to the facts before it, the Fifth Circuit concluded that, given Jones's particular job responsibilities, her solicitation of others to sue the company was not protected conduct for purposes of a retaliation claim. *Id.* *Jones* is very similar to the case at hand, and we have cited the Fifth Circuit's decision in *Jones* with approval. *See Rollins*, 868 F.2d at 401 (noting that *Jones* is "consistent" with this Court's precedent).

And in *Rollins*, we expanded on the "rendered-ineffective-in-the-job" test set out in *Rosser* and *Hamm.* Rollins filed a frequent number of both informal and formal complaints of discrimination. *Id.* at 398. Notably, in doing so, she

33

compromised none of the responsibilities of her position.  Specifically, she was a technician, not a human resources manager, and she filed a complaint only on her own behalf.  *Id.*  There was no solicitation or recruitment of other employees to file a complaint, nor would such conduct have conflicted with Rollins's job responsibilities as none of her job responsibilities involved working to resolve discrimination complaints.  Thus, her oppositional conduct did not render her ineffective in her position.  Nevertheless, we determined that the manner in which Rollins leveled her grievances—filing an overwhelming number of mostly spurious complaints and frequently doing so in an insubordinate and antagonistic manner—was unreasonable.  *Id.* at 399.  Given that reasonableness of oppositional conduct is determined by "balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment," *id.* at 401, Rollins' conduct—which clearly undermined a productive work environment—was not protected.  *Id.*

In short, *Rosser* established the principle that an employee's oppositional conduct loses its protection when the manner chosen to voice that opposition so interferes with the employee's performance of her job that it renders her ineffective in the position for which she was employed.  *Rollins* expanded on that principle, holding that even if an employee's oppositional conduct does not interfere with the

34

employee's performance of her own duties, it can still be deemed unreasonable—

and thereby lose its protected status—if the opposition is expressed in a manner

that unreasonably disrupts other employees or the workplace in general.  It is the

principle announced in *Rosser* that is most pertinent to our analysis in this case.

We reject the argument of our dissenting colleague, Judge Rosenbaum, that *Rollins*

is relevant to determining whether an employee's manner of opposition so

interferes with her job responsibilities that it is unprotected.  Our decisions in

*Rosser*, *Hamm*, and *Whatley* govern that question; *Rollins* instead concerns the

distinct question whether conduct that does not interfere with an employee's job

duties is nonetheless so disruptive that it does not qualify for protection.

The requirement that opposition to allegedly unlawful employment practices

must be done in a reasonable manner is well-established not only in this Circuit,

but also in sister circuits.  *See, e.g.*, *Matima v. Celli*, 228 F.3d 68, 79 (2d Cir. 2000)

("A question of retaliation is not raised by a removal for conduct inconsistent with

[the employee's] duties, unless its use as a mere pretext is clear." (alteration in

original) (quoting *Pendleton v. Rumsfeld*, 628 F.2d 102, 108 (D.C. Cir. 1980)));

*Robbins v. Jefferson Cty. Sch. Dist. R-1*, 186 F.3d 1253, 1259 (10th Cir. 1999)

(adopting *Rollins*'s reasonableness balancing test), *abrogated on other grounds*,

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002); *Laughlin v.*

*Metro. Wash. Airports Auth.*, 149 F.3d 253, 260 (4th Cir. 1998) (affirming district

35

court's decision that an employee did not engage in protected activity where she breached her employer's trust by copying confidential documents and giving them to an outside party, as "Title VII was not intended to immunize insubordinate, disruptive, or nonproductive behavior at work" (quotation omitted)); *Holden v. Owens-Illinois, Inc.*, 793 F.2d 745, 751 (6th Cir. 1986) (citing *Rosser* for the proposition that an employee's conduct is not covered by Title VII's opposition clause if the conduct "so interferes with the performance of [the employee's] job that it renders him ineffective in the position for which he was employed."); *Jones*, 793 F.2d at 728 (citing *Rosser* for the proposition that even sincere opposition to discriminatory practices under Title VII "may be so disruptive or inappropriate as to fall outside the protections of [Title VII]").[19]

Our dissenting colleague, Judge Martin, seems to question the validity of the legal principles applied in *Hamm* and *Jones* because appellate review of the ruling for the defendant in those cases occurred after a bench trial, instead of a motion for summary judgment. That fact does not vitiate the legal principles applied in those cases. In each case, both the district court and the appellate court proceeded

---

[19] The EEOC filed an amicus brief in favor of Gogel, however, its own guidance manual provides that "the protection of the opposition clause only applies where the manner of opposition is reasonable" and that "[o]pposition to perceived discrimination also does not serve as license for the employee to neglect job duties. If an employee's protests render the employee ineffective in the job, the retaliation provisions do not immunize the employee from appropriate discipline or discharge." EEOC Enforcement Guidance on Retaliation and Related Issues, 2016 WL 4688886, *8–9 (E.E.O.C. Guidance (Aug. 25, 2016)).

through the *McDonnell Douglas* framework in analyzing the retaliation claim.  In *Hamm*, we affirmed the district court's grant of judgment as a matter of law at the completion of the plaintiff's case, applying the *McDonnell Douglas* test and concluding that the plaintiff had failed to make a prima facie case because the manner of her opposition rendered that conduct unprotected.  *Hamm*, 708 F.2d at 653–54.  In *Jones*, the Fifth Circuit affirmed the district court's ruling for the defendant that, while the plaintiff had made a prima facie case of retaliation (she was fired after filing an EEOC charge), she had nonetheless failed to prove a causal connection between that act and the defendant's termination decision, given conduct by the plaintiff that sharply conflicted with her job responsibilities.  *Jones*, 793 F.2d at 724–25.

Nevertheless, whatever fact-finding the above district courts may have engaged in to reach their rulings, the appellate court's review of those decisions resulted in the articulation of legal principles that the appellate court then applied to the universe of facts before it.  Likewise, in this case we have applied those same principles recognized in our precedent to the undisputed material facts in this case.  In any event, *Rosser* did not involve a bench trial, but instead a summary judgment ruling that we affirmed, and in doing so we announced the seminal principle as to when an employee's conduct loses its protection that has been recognized in our circuit for forty years, a principle that controls in this case.

37

Before leaving the above discussion of our precedent concerning the circumstances under which otherwise protected conduct can lose its protection, we address our dissenting colleague Judge Rosenbaum's efforts to dismantle that precedent. Our colleague initially appears to give a grudging nod to the principle that an HR manager whose duty is to endeavor to resolve employee complaints internally violates that responsibility when she instead recruits a subordinate to sue the company and provides that subordinate with the name of an attorney to do so. But Judge Rosenbaum then crafts an exception so amorphous and unworkable as to gut this principle. Specifically, according to Judge Rosenbaum, if the HR manager is unhappy with the employer's decision not to conduct an investigation suggested by the manager or if, in the manager's view, the employer has engaged in conduct that the manager thinks might be discriminatory under Title VII, then the manager is transformed into a free agent who, no longer tethered to her previous job duties, may not only urge the discontented employee to sue, but also facilitate that effort by identifying a lawyer for the employee to use. In other words, now empowered to act as the ultimate arbiter of her employer's conduct, the manager is free to abandon the responsibilities of her position, yet still keep her job.

At bottom, Judge Rosenbaum argues that whenever a plaintiff HR manager with job responsibilities like Gogel's abandons those responsibilities because she finds fault with the employer's decisions and is then terminated, the balancing test

38

(discussed above) requires that the judicial decision-maker determine whether the manager should nonetheless be given a pass and allowed to remain in her job. Leaving aside the absence of any standard by which a court or jury would be guided in its decision whether to extend amnesty to an employee who has decided that she no longer needs to perform her job duties, this position turns on its head the long-standing principle that Title VII does not empower a court (or jury) to "sit as a super-personnel department that reexamines an entity's business decisions." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)).

As a corollary to the above argument, our dissenting colleague cites *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130 (5th Cir. Unit A 1981) in support of her position that only a jury can properly decide whether Gogel's solicitation of a subordinate to sue Kia, in contravention of her job responsibilities, is protected conduct. *Payne* does not support this contention nor override *Rosser*. The plaintiff in *Payne* was a seasonal laborer who, in the offseason, engaged in picketing and boycotting activities against his sometime employer based on his belief that the employer engaged in racially discriminatory practices. When he was not rehired as the next season rolled around, he sued under Title VII, claiming that the employer's failure to rehire him was done in retaliation for his protected activity of picketing. The legal question before the district court was whether the

39

plaintiff was required to prove that the employer had actually engaged in discriminatory practices or whether the plaintiff need only show his reasonable belief that the employer had done so.  We affirmed the district court's decision that the plaintiff must only show the latter.  *Id.* at 1140.

On appeal, however, the defendant employer argued for the first time that the form of plaintiff's opposition—boycotting and picketing by a former employee—did not constitute the type of activity that could be considered to be protected.  *Id.* at 1142.  We held that the employer was obliged to make that argument and introduce any supporting evidence when the case was before the district court, not for the first time on appeal.  *Id.* at 1144.   Further, because we were not prepared to say, as a matter of law, that picketing and boycotting by a former employee was "clearly unprotected," given that the plaintiff was not working for the defendant at the time of the activity and therefore had little opportunity for direct access to air his grievances,  *id.* at 1145, and because "further factual development [was] essential for a proper resolution of this issue," *id.* at 1146, we declined the defendant's request that we opine one way or the other as to whether the plaintiff's conduct was protected, *id*. at 1146 n.15.  Finally, because the employer had failed to raise this issue before the district court, we also declined to remand this question to the district court, but instead simply affirmed the latter's judgment for plaintiff.  *Id.* at 1146.

40

In the course of reaching this decision, we made the observation on which our dissenting colleague relies, "[a]t least where conduct is not unprotected as a matter of law, the fact finder must have an opportunity to hear evidence, to balance the competing considerations, and to reach a conclusion as to the reasonableness of the conduct." *Id.* Leaving aside the fact that the statement is arguably dicta,[20] it does not change the analysis of this case. In contrast with Gogel, there was no contention in *Payne* that, had he been rehired, the plaintiff's picketing activity while not employed with the company would so interfere with the performance of his job duties as a seasonal laborer that it would render him ineffective in that position, as was the case in *Rosser*. Further, the *Payne* court clearly did not say that summary judgment could never be warranted on the question whether particular conduct was protected; in fact, it cited with approval *Rosser*, which affirmed the granting of summary judgment to the defendant employer based on the latter's argument that the plaintiff's particular oppositional conduct was not protected because it rendered her ineffective in her job position. *Id.* at 1142–43. Finally, in this case, Gogel's solicitation of a subordinate to sue the company, and

---

[20] *See United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("As our cases frequently have observed, dicta is defined as those portions of an opinion that are 'not necessary to deciding the case then before us.'" (quoting *United States v. Eggersdorf*, 126 F.3d 1318, 1322 n.4 (11th Cir. 1997))). In *Payne*, as to the defendant's request that we consider its belated argument, we held that because the defendant's new argument required further factual development, it could therefore not be decided as a matter of law on appeal, and because the defendant should have earlier raised this argument before the district court, we likewise did not remand for the district court to oversee the necessary factual development.

her providing the name of a lawyer to help in that endeavor, so conflicted with her duties as Team Manager that this conduct rendered her ineffective in that position as a matter of law.

In short, we do not have to concern ourselves further with the problems inherent in the approach that our dissenting colleague puts forward because we have precedent that controls in this case and that precludes the new test that Judge Rosenbaum would have us adopt. To repeat, this precedent in *Rosser* provides that an employee's oppositional conduct loses its protection when the manner chosen to voice that opposition so interferes with the employee's performance of her job that it renders her ineffective in the position for which she was employed. And as explained below, that is what happened in this case.

### 2. Application of The Above Legal Standard to This Case

Turning to the present case, there is no dispute that Gogel had every right to oppose actions directed toward her by Kia that she deemed to violate Title VII. And throughout her tenure, she exercised her right to complain, particularly about the subject matter of her first EEOC charge: Kia's failure to classify Team Relations as its own separate department, with Gogel as its HOD. The making of informal complaints or the use of an internal grievance system is protected conduct under the opposition clause. *See Furcron v. Mail Centers Plus, LLC*, 843 F.3d 1295, 1311 (11th Cir. 2016) ("Title VII's protections are not limited to individuals

42

who file formal complaints, but extend to those who voice informal complaints as well." (citing *Rollins*, 868 F.2d at 400)). Likewise, there is no dispute that Gogel's filing of her own EEOC charge was also protected. Yet, Kia never disciplined Gogel for making these internal complaints nor did it fire Gogel upon learning that she had filed an EEOC charge. Instead, as noted above, after the latter event, Gogel was given a bonus and told that she was doing a good job.

As for oppositional conduct by Gogel on behalf of other employees, Gogel likewise enjoyed the right to report to management any concerns she had about the way in which Kia was treating its employees. And the record indicates that she did so. Gogel's internal advocacy before Kia management on behalf of other employees was clearly protected conduct. Yet, Gogel was never disciplined for advocating for other employees or relaying any complaints they may have shared.

But when Gogel surreptitiously recruited Ledbetter to sue Kia[21]—not just encouraging Ledbetter but giving her the name of the attorney with whom Gogel was also meeting—Gogel acted in direct conflict with her job responsibilities and was thereby rendered ineffective in the Team Relations manager position, as Kia could no longer trust Gogel to do the job for which she was hired. After all, it was

---

[21] Gogel and Ledbetter deny that Gogel recruited Ledbetter to sue Kia. See *infra* at 54 n.24. But as discussed *infra* at 54–56, the pertinent question for purposes of examining the propriety of Kia's decision to terminate Gogel is what Kia in good faith believed to have been Gogel's conduct. And Jackson's unrebutted testimony indicates that he believed Gogel to have so acted.

43

the Team Relations department to whom employees would address complaints about their employment, including complaints about discrimination or harassment. Team Relations members were hired to investigate complaints, resolve conflicts, and be an advocate for the team members in the best interests of the company.  As Team Relations manager, Gogel occupied a position of trust and confidence and was tasked with trying to maintain employee morale.  Further, as the testimony consistently indicated, the Team Relations department, and certainly its manager, were expected to interact with complaining employees in an effort to internalize the resolution of any complaint and thereby avoid, if possible, the external resolution of that complaint, such as the filing of an EEOC charge and a subsequent lawsuit.

Specifically, as Tyler, the HOD of Human Resources under whose umbrella Gogel's Team Relations operated, acknowledged, Team Relations was charged with "[e]nsuring a positive work environment and ensuring that team members (employees) don't have a need to seek out third parties," to resolve their complaints.  By third parties, Tyler meant "litigation and lawsuits," "government organizations," and "labor unions."  Tyler agreed that Kia's expectations for its Team Relations manager was someone "who could interact with the employees to avoid the employees going to third parties."

44

Likewise, Jackson explained that the Team Relations manager is expected to advise him at all times if the manager becomes aware that an employee is considering legal action.  He explained that a manager is absolutely not supposed to solicit litigation against the company or recruit an employee to sue, and to do so would be in conflict with the responsibilities of the position.  As Jackson testified, "I don't want my team relations manager out soliciting and encouraging other team members to file lawsuits.  That's not what she's paid to do.  That's not what she was hired to do."  Jackson reiterated this point: "[S]he shouldn't be out soliciting and encouraging other team members to file lawsuits.  She's paid to prevent lawsuits.  She's paid to let me know [] if other people are interested in filing lawsuits.  That's what her job is supposed to be doing."  And again: "She has an obligation to let me know that if she knows someone is going to file a lawsuit against our company, she has the . . . responsibility to let me know about that."  And yet again: "I think I said earlier that I had a major concern with my Manager of Team Relations soliciting and encouraging other team members to file a lawsuit against our company.  That role is paid to help people and prevent lawsuits from being filed, not to encourage and solicit lawsuits to be filed. . . . The Team Relations Manager's role is to do everything possible to keep—or basically not to encourage other team members to file lawsuits against our company."

45

Similarly, Williams, the assistant Team Relations manager who worked directly under Gogel, also agreed that in recruiting Ledbetter to sue the company, Gogel had acted contrary to the expectations of her job, which was to try to resolve an employee's problem without the latter taking legal action, not encourage the employee to take that action: "I mean you don't go to a doctor to get leukemia. We're the people that's [*sic*] supposed to keep lawsuits from happening."

Likewise, Kia's Rule 30(b)(6) witness, Latesa Bailey, who later succeeded Tyler as Kia's HOD of Human Resources, testified that a Team Relations manager is the person in charge of employee relations for the entire company, and that a Team Relations manager who solicits an employee to sue the company has acted "in direct contradiction to what she was actually hired for." "[Gogel's] primary job duty was to resolve employment conflicts, any type of disputes, to try to resolve them before they got out to an outside party, such as an attorney or the EEOC." Given the responsibilities of Gogel's position, it was a breach of those responsibilities for her instead to recruit a team member to sue the company. As Bailey noted, "I don't know a company that actually hires someone [as a Team Relations manager] . . . to solicit team members to file a charge against the company for a lawsuit."

Gogel likewise agrees that Team Relations conducted investigations into employees' allegations of discrimination and that it was her department's

46

responsibility to assist Jackson in resolving potential discrimination problems.  She acknowledges that she would have been involved in making a recommendation as to the disposition of an investigation, either to Jackson or the legal department or both.  Her involvement was particularly important when the investigation concerned a member of management.

All of the witnesses identified above—the Vice President for Human Resources, two HODs of Human Resources, and Gogel's assistant Team Relations manager—testified that it was an important part of the Team Relations manager's job to attempt to resolve employee complaints in a way that would avoid litigation.  Jackson and Bailey further testified that a Team Relations manager who instead solicits an employee to sue the company has acted in direct contradiction to what she was actually hired for.  Gogel provides no evidence contradicting the testimony of these Kia witnesses that a Team Relations manager was expected to investigate an employee's complaint with the goal of resolving that complaint internally or, conversely, that a Team Relations manager who recruits an employee to sue the company has acted in conflict with a central responsibility of her position.  Instead, her only attempted response to this undisputed evidence is itself not responsive.

For example, Gogel proffers her own testimony that she lacked any power to prevent a complaining employee from filing a lawsuit against the company, "as [her] duties included problem solving, but not preventing lawsuits.  [Kia] has a

47

Legal Department that handles legal situations at [Kia]."  But of course, no one contends that Gogel, or anyone else for that matter, can actually prevent an employee from filing an EEOC charge and subsequent lawsuit if the latter chooses to do so.  Nor does Kia disagree that once an EEOC charge is filed, the legal team takes the lead in responding to that charge.  Yet, that Gogel lacked the power to prevent an employee from suing and that she did not handle the legal response once an EEOC charge was actually filed does not mean that she was not expected to try to handle matters in a way that would resolve the employee's grievance short of any such litigation, as all the witnesses testified.  And soliciting an employee to sue the company falls well short of endeavoring to resolve that employee's concerns short of litigation.  Further, conceding that her job was "to problem-solve," Gogel offers no disagreement that encouraging Ledbetter to sue the company would not have helped Kia solve any potential conflicts it might have had with Ledbetter.

Gogel notes that the job description for Team Relations manager does not include a requirement that the manager "prevent lawsuits."  She further averred in her post-deposition declaration that she interpreted language in the job description providing that the Team Manager should endeavor to "prevent unwelcomed activity" as describing union activity, not the "EEO or legal activity."  It is true that the job description, which is written at a high level of generality, does not expressly

48

state that a Team Relations manager should try to prevent lawsuits. Yet, Gogel acknowledges that it was her duty as Team Relations manager to help Kia resolve any problems it might have with an employee. Not surprisingly then, and regardless of what the job description may or may not have covered, the undisputed testimony indicates that Kia considers a Team Relations manager's encouragement of a disgruntled employee to sue the company as inconsistent with an attempt to resolve the problem in a manner consistent with the company's best interests. Nor, as this testimony indicates, does Kia consider a manager's act of clandestinely providing that employee with the name of a lawyer to use to sue the company as conduct satisfying the manager's responsibility to keep the appropriate parties informed of the status of an employee's complaint.[22] Instead, as Tyler testified, it was Kia's expectation that a Team Relations manager was someone who would interact with the employees in a manner that would avoid the latter "going to third parties" and resorting to litigation. Likewise, as discussed previously, Jackson and Bailey made clear that in soliciting Ledbetter to sue and in encouraging that effort by providing Ledbetter with the name of the same attorney

---

[22] As Jackson testified, Gogel was "paid to let me know [] if other people are interested in filing lawsuits. That's what her job is supposed to be doing. . . .She has an obligation to let me know [] if she knows someone is going to file a lawsuit against our company. . . .She should let me know what she knows."

with whom Gogel had decided to meet, Gogel's conduct was inconsistent with her job responsibilities.

Thus, the pertinent factual inquiry is whether recruiting an employee to sue the company would have been consistent with the responsibilities entrusted to the Team Relations manager by Kia. Gogel is notably silent on this point, never affirmatively denying or otherwise presenting evidence contesting Kia's position that such conduct would fundamentally conflict with the expectations that it held for a manager in that position. In short, the undisputed testimony indicates that the Team Relations manager acts in contradiction of the responsibilities inherent in that position if she solicits an employee to sue the company and provides the employee with the name of an attorney to facilitate that endeavor.

Instead of tackling head-on Kia's determination that Gogel's conduct so conflicted with the responsibilities of her job that it irrevocably undermined the trust Kia believed it must have in the manager holding this tremendously significant position, Gogel denies that she ever engaged in such conduct.[23] Thus,

_____

[23] In support of this contention, Gogel avers that "I did not solicit others to further my own agenda . . . . I did not encourage others to file a Charge against [Kia]. I did not encourage others to sue [Kia]." In addition to her own denial of any effort to solicit, recruit, or encourage Ledbetter to sue, Gogel offered a declaration by Ledbetter, who stated: "Neither [Gogel] nor [Tyler] told me to file a Charge with the EEOC. I made this decision for myself as a professional woman. [Gogel] did not solicit me to do anything against [Kia]. [Gogel] did not encourage me nor solicit me to get an attorney and sue the company or file an EEOC charge . . . . I made the decision to file an EEOC charge with my attorney, not because [Gogel] told me to. I made the decision to retain an attorney as well. There was no 'collusion.'" Ledbetter further denies that

50

Gogel essentially argues that even if her recruitment of another employee to sue the company would have rendered her ineffective in her position and would have warranted Kia's loss of confidence in her ability to continue to perform her highly confidential and sensitive job duties, these reasons cannot justify her termination because she never in fact solicited Ledbetter to sue the company. But this argument misapprehends the focus of the inquiry in Title VII cases. As our precedent makes clear, when assessing whether an employer has properly imposed an adverse action on an employee based on that employee's conduct, the question is not whether the employee actually engaged in the conduct, but instead whether the employer in good faith believed that the employee had done so. As we have stated before when a similar argument was made by an employee against whom an adverse action was taken,

> [t]he inquiry . . . centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head. . . . The question is whether [the] employers were dissatisfied with [the employee] for these or other non-discriminatory reasons, even if mistakenly or unfairly so, or instead merely used those [reasons] as cover for discriminating against her. . . .
>
> In analyzing issues like this one, "we must be careful not to allow Title VII plaintiffs simply to litigate whether they are, in fact, good employees."

---

she ever told Williams that Gogel was the leader of any effort to file a charge with the EEOC or that she, Gogel, and Williams were planning to sue the company and had the same attorney. Ledbetter, however, does not address how she happened to retain the same attorney as did Gogel and Tyler.

51

*Alvarez*, 610 F.3d at 1266 (internal citations omitted) (quoting *Rojas v. Florida*,

285 F.3d 1339, 1342 (11th Cir. 2002)).

The relevant inquiry is therefore whether the employer in good faith

believed that the employee had engaged in the conduct that led the employer to

discipline the employee. *See Elrod*, 939 F.2d at 1470. Thus,

> [w]hen an employer is told of improper conduct at its workplace, the
> employer can lawfully ask: is the accusation true? When the resulting
> employer's investigation . . . produces contradictory accounts of
> significant historical events, the employer can lawfully make a choice
> between the conflicting versions—that is, to accept one as true and to
> reject one as fictitious—at least, as long as the choice is an honest
> choice.

*Total Sys. Servs.*, 221 F.3d at 1176. To be clear,

> [t]he role of this Court is to prevent unlawful [Title VII] practices, not
> to act as a super personnel department that second-guesses employers'
> business judgments. Our sole concern is whether unlawful
> discriminatory [or retaliatory] animus motivates a challenged
> employment decision. Whether [an employee's conduct] was
> insubordinate is not an issue for this Court to referee.

*Wilson*, 376 F.3d at 1092 (internal citations and quotation marks omitted). "An

employer 'may fire an employee for a good reason, a bad reason, a reason based on

erroneous facts, or for no reason at all, as long as its action is not for a

discriminatory [or retaliatory] reason.'" *Damon v. Fleming Supermarkets of Fla.,*

*Inc.*, 196 F.3d 1354, 1363 n.3 (11th Cir. 1999) (emphasis omitted) (quoting *Jones*

*v. Bessemer Carraway Med. Ctr.*, 151 F.3d 1321, 1324 n.16 (11th Cir. 1998)); *see*

*also Elrod*, 939 F.2d at 1470 ("Federal courts 'do not sit as a super-personnel

52

department that reexamines an entity's business decisions.  No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, [we] do[] not interfere.  Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.'" (quoting *Mechnig*, 864 F.2d at 1365)).

There is no evidence in this record to rebut Jackson's repeated and insistent testimony that he believed Gogel had recruited Ledbetter to sue the company.  He saw that Ledbetter's EEOC charge had been faxed from the same law firm that Gogel was using in pursuing her own recently filed EEOC charge.  Given the large number of lawyers available, Jackson was understandably skeptical that Ledbetter would have randomly picked the same Atlanta law firm as did Gogel and Tyler without some involvement from the latter.  Indeed, Jackson immediately contacted his Korean counterparts, including the president of Kia, to alert them to his suspicion that Gogel was "recruiting" other employees to sue.

In fact, Gogel finally acknowledged during this litigation that she had provided Ledbetter with the name of the attorney with whom Gogel stated she planned to meet regarding her own action against Kia.  Gogel argues that we cannot consider this admission in assessing the genuineness  of Jackson's belief that Gogel had so acted because Gogel had not revealed to Jackson, prior to his decision to fire her, that she had, indeed, provided Ledbetter with the name of an

53

attorney to represent her.  For sure, Gogel never revealed this important fact to Jackson when he called her in to determine whether she had any involvement in Ledbetter's decision to sue.  Nor could Jackson know when he fired Gogel that she would later admit to this conduct.  This fact, however, is not helpful to Gogel. What matters in this inquiry is what the employer in good faith believes the employee to have done, not whether the employee actually engaged in the particular conduct.  *See Elrod*, 939 F.2d at 1470.  Yet, the fact that Gogel has now made a concession that tends to confirm the accuracy of Jackson's beliefs is hardly a fact that serves in any way to undermine the genuineness of those beliefs.  And the genuineness of those beliefs is further confirmed by additional information that Jackson obtained after receiving Ledbetter's EEOC charge.

Specifically, after Jackson had received Ledbetter's EEOC charge, Williams and Grimes, assistant managers of Team Relations, met with Jackson and informed him of a large number of long, closed-door meetings between Gogel and Ledbetter in the preceding weeks—meetings that seemed out of the ordinary not only to Williams and Grimes, but also to Jackson.[24]  Even more significantly, Williams

---

[24] Citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), Gogel argues that we should disregard any testimony from Jackson, Williams, or Grimes in considering whether to affirm the district court's decision to grant summary judgment because these men were arguably "interested witnesses."  We rejected a virtually identical argument in *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1205 n.14 (11th Cir. 2013).  Other circuits have also rejected any reading of *Reeves* as precluding summary judgment where the movant relies on testimony of interested witnesses.  *See, e.g.*, *LaFrenier v. Kinirey*, 550 F.3d 166, 168 (1st Cir. 2008); *Lauren*

reported that Ledbetter had confided in him that she, Gogel, and Tyler were planning to sue the company, that they were going to use the same lawyer, and that Gogel was the ringleader.  As noted, Jackson subsequently met with Gogel who, in denying any collusion with Ledbetter, also denied having had any significant recent meetings with Ledbetter, contrary to the reports of Williams and Grimes. Based on all of this information, Jackson concluded that Gogel had in fact encouraged and recruited Ledbetter to sue Kia.[25] As a result, Jackson decided that he had "no alternative but to discharge" Gogel, as he had lost both confidence in Gogel's loyalty and the trust that was necessary for her to function in her position as Team Relations manager.  Gogel has offered no evidence that would call into question the genuineness of the beliefs that led Jackson to this conclusion.

---

*W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 271–72 (3d Cir. 2007); *Stratienko v. Cordis Corp.*, 429 F.3d 592, 597–98 (6th Cir. 2005); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002); *Traylor v. Brown*, 295 F.3d 783, 790–91 (7th Cir. 2002).

[25] Our dissenting colleague, Judge Rosenbaum, argues that Jackson should have done a more thorough investigation before reaching this conclusion.  But as we have previously noted when dealing with a similar objection to an employer's personnel action based on the employer's good faith belief:  "[I]n carrying out its business and in making business decisions (including personnel decisions), the employer can lawfully act on a level of certainty that might not be enough in a court of law.  In the workaday world, not every personnel decision involving a false statement (or a cover-up) has to be treated as something like a trial for perjury.  Therefore, an employer, in these situations is entitled to rely on its good faith belief about falsity, concealment, and so forth . . . . 'Pretext is not demonstrated by showing simply that the employer was mistaken.'" *Total Systems Servs.*, 221 F.3d at 1176.  Here, Gogel has offered no evidence from which one could reasonably infer that Jackson did not genuinely believe that Gogel had recruited Ledbetter to sue the company and had provided her with the name of a lawyer to use in that endeavor.

In summary, an employee's oppositional conduct under Title VII is not protected if the means by which the employee has chosen to express her opposition so interferes with the performance of her job that it renders her ineffective in the position for which she is employed. Kia held a good faith belief that Gogel had abandoned her responsibility to try to resolve an employee's dispute without litigation when she instead actively solicited a complaining employee to sue the company and provided the employee with the name of an attorney to use. Once aware of Gogel's conduct, Kia determined it could no longer keep her as its Manager of Team Relations, the department to which unhappy employees were sent to air their complaints. In other words, Kia could no longer trust Gogel to do her job.

Stated another way, Kia did not fire Gogel because she opposed some of its employment practices. Gogel had expressed her opposition to various employment practices repeatedly throughout her tenure through internal complaints to management, with no adverse action taken against her for that opposition. Rather, Kia fired Gogel because, by recruiting Ledbetter to sue the company, Gogel chose to act in a way that conflicted with the core objectives of her sensitive and highly important position. Her actions having rendered her entirely ineffective as manager of the Team Relations department, the manner of her oppositional

56

conduct with respect to Ledbetter was necessarily unreasonable, and the conduct was not protected under Title VII.

## III.   CONCLUSION

For all the above reasons, Gogel's retaliation claim fails, and we affirm the district court's grant of summary judgment to Kia as to all claims.

**AFFIRMED.**

WILLIAM PRYOR, Chief Judge, concurring:

I join the majority opinion in full. I write separately to respond to the suggestion of my dissenting colleagues that a difference of opinion among judges about whether to affirm a summary judgment reveals the presence of a jury question that precludes summary judgment. Because 13 appellate judges are "divided in their views" on whether the district court correctly granted summary judgment in this employment-discrimination suit, Judge Martin's dissent suggests that the absence of a jury question is "improbable." Martin Dissenting Op. at 71. Of course, it should go without saying that counting judicial noses cannot tell us whether a genuine dispute of material fact exists. *See* Fed. R. Civ. P. 56(a). But if nose counting is relevant, the dissenters fail to mention that *nine* of the 14 judges to consider the issue—including the district judge who granted summary judgment—concluded there was no jury question. Only five think otherwise. So instead of making the absence of a jury question "*im*probable," Martin Dissenting Op. at 71 (emphasis added), judicial nose counting suggests the opposite. *See Probable*, *Webster's New International Dictionary* (2d ed. 1959) ("Having more evidence for than against."). And more importantly, so does legal analysis. As the majority opinion explains, faithful application of our precedent leaves no doubt that the district court correctly granted summary judgment for the employer.

JORDAN, Circuit Judge, concurring in the judgment:

I agree with much of what Judges Martin and Rosenbaum have written in their dissents. The majority, for example, does not take all of the facts in the light most favorable to Ms. Gogel, fails to explain where in the *McDonnell Douglas* framework it is conducting its protected conduct analysis, and relies too heavily on cases that arose in procedurally different postures. Despite these concerns with aspects of the majority opinion, I concur in the judgment.

Ms. Gogel, who was the manager of team relations at Kia, has always denied encouraging or soliciting other employees to sue the company. *See, e.g.,* D.E. 101-1 at 14–15 (Ms. Gogel's declaration). In her deposition, Ms. Gogel testified that when Mr. Jackson accused her of "colluding" with Ms. Ledbetter against Kia, she denied the accusation and provided proof that her meetings with Ms. Ledbetter were for legitimate work-related matters. *See* D.E. 117 at 66. For her part, Ms. Ledbetter similarly denied that Ms. Gogel encouraged her to file an EEOC claim against Kia. *See* D.E. 101-2 at 3–4 (Ms. Ledbetter's declaration).

Because we are at the summary judgment stage, and must consider the evidence in the light most favorable to Ms. Gogel, we have to assume that she did not encourage or solicit others to take legal action against Kia. As a result, there is no need to consider whether, as an abstract matter, any actual solicitation by Ms. Gogel would constitute protected conduct under Title VII.

59

Taking her version of events as true, Ms. Gogel established a *prima facie* case on her opposition and retaliation claims.  But Kia presented a non-discriminatory reason for its termination decision—that it believed that Ms. Gogel recruited, encouraged, or solicited Ms. Ledbetter (and maybe Mr. Tyler) to sue the company. On this record, I do not believe Ms. Gogel created a jury issue as to pretext under *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 143–46 (2000).

Kia had evidence that Ms. Gogel, Ms. Ledbetter, and Mr. Tyler were being represented by the same law firm.  It also had the statements of another managerial employee about what Ms. Gogel was supposedly doing.  Mr. Williams, an assistant manager working under Ms. Gogel, informed Kia that Ms. Ledbetter had told him (a) that she, Mr. Tyler, and Ms. Gogel were planning to sue the company using the same law firm; (b) that the three of them were "talking together and working together;" and (c) that Ms. Gogel was the ringleader.  *See* D.E. 123 at 52, 79.

Ms. Gogel denied having significant interactions with Ms. Ledbetter when questioned, but given the circumstances Kia was not required to accept her denials. We have long said that "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance." *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997).  Indeed, we have held that where an employer relies on a report of an employee's alleged wrongdoing, the question is not whether the report is accurate, but rather whether the employer "reasonably

60

believed" that it was.  *See Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989).  Based on the information it had, Kia reasonably believed that Ms. Gogel had solicited other employees to sue the company, and that this conduct by a managerial employee was an unreasonable way of demonstrating her opposition.  *See generally Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 401 (11th Cir. 1989) ("some otherwise protected conduct may be so disruptive or inappropriate as to fall outside Title VII's protection").

With respect to retaliation, sometimes temporal proximity between the protected activity and adverse action is enough to take a case to the jury.  But even in cases where the plaintiff has established temporal proximity, the employer can rebut inferences of improper motive by articulating non-discriminatory reasons for the adverse action.  Given cases like *Holifield* and *Hawkins,* I think Kia has done that here.  *See Walden v. Centers for Disease Control and Prevention*, 669 F.3d 1277, 1290 (11th Cir. 2012) (holding, in a Title VII case, that a temporal proximity of three weeks was not enough to overcome evidence showing that the employee was removed for a legitimate reason).  *Cf.  Wascura v. City of S. Miami*, 257 F.3d 1238, 1247 (11th Cir. 2001) (holding, in an ADA case, that where ample legitimate reasons supported a termination decision, temporal proximity alone was insufficient to meet the plaintiff's burden of showing that the employer's articulated reasons for termination was pretextual).

61

I recognize that an employee can sometimes create an issue of fact as to pretext by showing that the employer's purported non-discriminatory reason is simply untrue. *See Reeves*, 530 U.S. at 143–46. In my view, however, Kia reasonably believed that Ms. Gogel had engaged in soliciting lawsuits by other employees based on Mr. Williams' statements about what Ms. Ledbetter had said and the evidence that Ms. Gogel, Ms. Ledbetter, and Mr. Tyler were being represented by the same law firm. Accepting as true her denials of improper conduct, Ms. Gogel has not presented sufficient evidence to permit a jury to find that Kia's proffered reason for her termination is "unworthy of credence." *Id*. at 143 (internal citation and quotation marks omitted).

WILSON, Circuit Judge, concurring in part and dissenting in part:

Had Andrea Gogel not filed her own discrimination claim, I would join the majority's opinion in full. Indeed, I concur with the majority's view that Title VII does not protect an employee's opposition conduct if the conduct so interferes with the performance of her job duties that it renders her ineffective for the position for which she was employed. Kia says it fired Gogel because she encouraged other employees, including Diana Ledbetter, to file a charge of discrimination against the company, which was inconsistent with her responsibility as a Human Resource employee to protect the company from liability. Title VII's opposition clause does not protect such conduct. And if that were her only claim, Gogel would rightfully lose at summary judgment.

But that is not her only claim; she also brings a claim under Title VII's participation clause. And there is more than enough circumstantial evidence in this record that a jury could reasonably rely upon to conclude that Gogel was fired in retaliation for filing her own charge of discrimination, which is protected activity under Title VII's participation clause, separate and apart from her conduct under the opposition clause. Summary judgment on that claim should have been denied.

As Gogel stated in her Amended Complaint, "[Kia's] retaliation against [her] was on account of her participation in the [Equal Employment Opportunity Commission (EEOC)] charge filing process and because of her opposition to

63

discrimination . . . ."  She further alleged that, "[b]ut for her act of filing an EEOC charge, she would not have been terminated."

As we have stated, Title VII prohibits an employer from retaliating against an employee "because the employee has opposed any unlawful employment practice" (the opposition clause), or "because of participation in a Title VII investigation or hearing" (the participation clause)."  *Furcron v. Mail Ctrs. Plus, LLC*, 843 F.3d 1295, 1310 (11th Cir. 2016) (alterations accepted); *accord* 42 U.S.C. § 2000e-3(a).  Indeed, § 2000e-3(a) explicitly protects someone, such as Gogel, who "has made a charge."  Consequently, when Gogel filed her charge of discrimination with the EEOC on November 10, 2010, she engaged in protected conduct under the participation clause, which provides near limitless protection against retaliatory acts.  *See Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1353 (11th Cir. 1999) (holding that § 2000e-3(a)'s "participated in any manner" clause includes and protects an employee's participation in an employer's post-charge internal investigation, a form of participation more indirect than Gogel's).

This is the relevant timeline for Gogel's participation-clause claim: Gogel filed her charge of discrimination with the EEOC alleging sex- and national-origin discrimination on November 10, 2010.  Kia received notice of it on November 22, 2010.  On December 3, 2010, Gogel was placed on administrative leave pending her signature on an "acknowledgement" document created by Kia, which she

64

signed on December 6, 2010.  Curiously, Kia gave her a $12,000 bonus check on

December 22, 2010, and, according to Gogel, told her "she was doing a good job,"

which a factfinder could interpret various ways.  But then she was admonished

about issues related to Diana Ledbetter (which the majority details), and she

received her termination letter on January 21, 2011.  On February 8, 2011, she

filed the second charge with the EEOC based on retaliation.

Absent direct evidence of discrimination, we analyze claims for

discrimination under the framework set forth in *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792 (1973) and subsequently modified in *Texas Department of*

*Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also Standard v. A.B.E.L.*

*Servs., Inc.*, 161 F.3d 1318, 1331–32 (11th Cir. 1998).  "Under this framework, a

plaintiff alleging retaliation must first establish a prima facie case by showing that:

(1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse

employment action; and (3) [s]he established a causal link between the protected

activity and the adverse action."  *Bryant v. Jones*, 575 F.3d 1281, 1307–08 (11th

Cir. 2009).  "Once a plaintiff establishes a prima facie case of retaliation, the

burden of production shifts to the defendant to rebut the presumption by

articulating a legitimate, non-discriminatory reason for the adverse employment

action."  *Id*. at 1308.  "After the defendant makes this showing, the plaintiff has a

full and fair opportunity to demonstrate that the defendant's proffered reason was

65

merely a pretext to mask discriminatory actions." *Id*. As we have held,

"[d]emonstrating a prima facie case is not onerous; it requires only that the plaintiff

establish facts adequate to permit an inference of discrimination [or retaliation]."

*Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam); *see also*

*Burdine*, 450 U.S. at 253–54.

Kia concedes that Gogel can satisfy the elements of a prima facie case of

retaliation for her termination. In its reply in support of its motion for summary

judgment, Kia stated that it "does not contest that [Gogel's] filing of her personal

EEOC charge on November 3, 2010 was protected activity, and for the purpose of

summary judgment, assumes that [she] has made out the minimal requirements of a

prima face case."

In any event, a prima facie case is established here: (1) Gogel filed her

charge; (2) she was fired; and (3) these events were separated by two months. *See*

*Bryant*, 575 F.3d at 1307–08. "The burden of causation can be met by showing

close temporal proximity between the statutorily protected activity and the adverse

employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th

Cir. 2007) (per curiam). We construe the causal-link element broadly; "a plaintiff

merely has to prove that the protected activity and the negative employment action

are not completely unrelated." *Olmsted v. Taco Bell Corp*., 141 F.3d 1457, 1460

(11th Cir. 1998). In *Olmstead*, we determined that the plaintiff's termination was

66

casually related to his complaints of racial discrimination and was appropriately submitted to the jury, even though the period between his complaint and termination was about five- to six-months apart. *Id.* at 1459–61. In Gogel's case, the filing of the charge and the date of termination were only two months apart.

The burden then shifts to Kia to articulate a legitimate reason for Gogel's termination. *See Bryant*, 575 F.3d at 1308. Kia says Gogel was terminated because the company lost confidence in her ability to perform her job duties after an investigation showed that she had solicited Ledbetter to file a charge against Kia, which was in violation of the agreement they made her sign on December 6, 2010. That is a legitimate reason. Kia has thus discharged its burden of production, and the burden shifts back to Gogel to show that this assertion is merely a pretext for discrimination and retaliation. *See id.*

To survive summary judgment Gogel must point to sufficient evidence to create a genuine issue of material fact regarding whether the reason Kia gives for her termination is merely a pretext for retaliation and discrimination. *See id.* Her evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Kia's] proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). The reason for this framework is obvious—what sophisticated employer, after 54 years of Title VII

jurisprudence, would state in a termination letter that the employee is fired for bringing a discrimination complaint against the company?  So, Gogel can create an issue of fact at the pretext stage by (1) presenting evidence that Kia's proffered reason is not worthy of belief; or (2) presenting evidence that retaliation was, in fact, Kia's real reason.  *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000).  Evidence establishing the prima facie case and any inferences drawn therefrom may also be considered when determining whether pretext has been shown.  *Id.* at 143; *see St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993).

Gogel's evidence in support of pretext is more than sufficient to defeat summary judgment.  A Title VII plaintiff can meet the pretext burden by showing temporal proximity between her protected conduct and the adverse employment action.  *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000).  Only weeks after Gogel filed her charge with the EEOC, she was threatened with the loss of her job and suspended until she signed a document promising to forego her rights to support her charge.  Less than two weeks later, she was fired.  In *Thomas*, we concluded that a three- to four-month period between when an employee filed a sexual-harassment complaint and when she was fired was not enough, *on its own*, to establish a causal connection.  506 F.3d at 1364.  Here, the temporal proximity is much closer, as Gogel was terminated just

68

two months after the date Kia received notice of her charge. That is surely close enough that a factfinder could infer retaliation.

And unlike the plaintiff in *Thomas*, Gogel points to additional evidence tending to show causation. Before the district court, Gogel argued that certain "me too" evidence demonstrated that Kia retaliated against other employees who made internal complaints and filed EEOC charges. Gogel pointed to evidence regarding two incidents related to her case. The first was that Robert Tyler, another Human Resources employee who lodged an internal discrimination complaint and filed an EEOC charge, testified that he was terminated on January 6, 2011, shortly before Gogel was terminated. And the second was that Ledbetter attested that Kia coerced her to drop her EEOC charge. We have said before that "me too" evidence can be used "to prove the intent of [an employer] to discriminate and retaliate." *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008).

Moreover, Gogel testified at her deposition that she did not encourage, solicit, or coerce Ledbetter to file a charge of discrimination. And Ledbetter attested that she decided on her own to file her EEOC charge, and that Gogel "did not encourage [her] nor solicit [her] to get an attorney and sue the company or file an EEOC Charge." Ledbetter also attested that there was no collusion. More specifically, she declared that she "never told Arthur Williams that [Gogel] was the 'leader' of [her] and [Tyler] in filing a Charge with the EEOC" or that "all three of

69

[them] were going to sue [Kia] and had the same attorney." While this testimony matters little in the opposition-clause context, it matters in the participation-clause context. If true, it could support that Kia's belief that such conduct occurred was unreasonable. In any event, Kia is entitled to impeach Gogel's credibility about these crucial facts on cross-examination at a trial. Credibility evaluations are within the province of the jury, not this court.

Viewing the evidence in this record in the light most favorable to Gogel, which we are obligated to do, there is a genuine issue of fact about whether Kia terminated Gogel because she filed a charge of discrimination against the company. Unfortunately, the majority does not view the evidence in the light most favorable to Gogel. Instead, it adopts the role of factfinder, ignores Gogel's evidence, and tips the scales in Kia's favor.

Simply put, a reasonable jury could conclude that Kia's reason for terminating Gogel—that she counseled Diana Ledbetter to file an EEOC charge— was pretextual. Although her conduct may not be protected under Title VII's opposition clause, the charge of discrimination that she filed on her own behalf constitutes protected conduct under Title VII's participation clause. The case should have gone to the jury on that basis.

70

MARTIN, Circuit Judge, joined by ROSENBAUM and JILL PRYOR, Circuit Judges, dissenting:

Andrea Gogel was fired after she challenged gender discrimination at Kia Motors Manufacturing, Georgia ("Kia"). Instead of allowing a jury to decide the facts in dispute about Kia's true motivations for firing Ms. Gogel, this Court has now dedicated nearly four years and the extensive attention of 13 judges, divided in their views, to reach the improbable conclusion that there is no such dispute. The result is a majority opinion that incorrectly applies the law governing opposition conduct protected by Title VII; glosses over disputes of fact about Ms. Gogel's core job responsibilities; and fails to consider evidence suggesting that the reasons Kia gave for Ms. Gogel's dismissal were a pretext for unlawful retaliation. The six separate opinions that make up this en banc ruling on Ms. Gogel's case, written by as many judges, paint a rich picture of the many triable issues of fact about whether Kia fired her because she engaged in activities protected by Title VII. I would reverse the grant of summary judgment to Kia on Ms. Gogel's claim for unlawful retaliation. I dissent from the majority's judgment in favor of Kia here.

## I.

I begin by setting forth the standard for applying the burden-shifting framework described in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S.

Ct. 1817 (1973).  McDonnell Douglas imposes a three-step framework for

evaluating workplace discrimination claims based on circumstantial evidence.

First, the employee must show a prima facie case of discrimination.  Then, the

employer must respond by articulating a legitimate, nondiscriminatory reason for

its adverse employment action.  Finally, the employee must show that the reason

given by the employer was "mere pretext."  Quigg v. Thomas Cnty. Sch. Dist., 814

F.3d 1227, 1237 (11th Cir. 2016).  This Court has relied on this familiar and well-

worn analytic tool for well over four decades.  Its purpose is to "progressively . . .

sharpen the inquiry into the elusive factual question of intentional discrimination"

and thereby "help[] . . . determine whether the litigants have created an issue of

fact to be decided by the jury."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S.

248, 255 n.8, 101 S. Ct. 1089, 1094 n.8 (1981).

The central question of Ms. Gogel's case is the nature of her opposition

conduct and whether it was protected by Title VII.  In most circumstances, firing

an employee for assisting a coworker with filing an Equal Employment

Opportunity Commission ("EEOC") complaint—the primary basis of Ms. Gogel's

dismissal—amounts to retaliation for protected opposition conduct.  See Hobgood

v. Ill. Gaming Bd., 731 F.3d 635, 642–43 (7th Cir. 2013); see also Rosser v.

Laborers' Int'l Union of N. Am., Local No. 438, 616 F.2d 221, 223 (5th Cir.

1980).[1]  But of course the protections of Title VII's opposition clause are not absolute.  To qualify for protection, "the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable."  Rollins v. Fla. Dep't of Law Enf't, 868 F.2d 397, 401 (11th Cir. 1989) (per curiam).  Our precedent has recognized two principal ways in which an employee's opposition conduct may be unreasonable and thus fall outside of the protection of the statute: (1) if that conduct is highly disruptive, see id. at 400-01, or (2) if that conduct "so interferes with the performance of [the employee's] job that it renders [her] ineffective in the position for which [s]he was employed," Rosser, 616 F.2d at 223.  Whether opposition activity was so unreasonable as to fall outside the protection of the statute is a "case by case" determination made by "balancing the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment."  Rollins, 868 F.2d at 401.

Our precedent is clear that the question of whether opposition conduct falls under the protections of Title VII should, at the summary judgment stage, be evaluated within the three-step McDonnell Douglas burden-shifting framework,

---

[1] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. Id. at 1209.

73

rather than under the "clearly erroneous" standard applied following an employment discrimination trial.  Compare Payne v. McLemore's Wholesale & Retail Stores, 654 F.2d 1130, 1144 (5th Cir. Unit A Sept. 1981) (applying McDonnell Douglas at summary judgment) with Jones v. Flagship Int'l, 793 F.2d 714 (5th Cir. 1986) (explaining that district court findings would not be reversed unless they were clearly erroneous).

### A. The majority improperly relies on precedent governing appellate review after trial.

The three McDonnell Douglas steps are designed to flush out proof of an employer's "single, true reason for an adverse action."  Quigg, 814 F.3d at 1237 (quotation marks omitted).  However, the majority opinion misapplies the McDonnell Douglas burden shifting process because it relies on our Circuit precedent governing the review of trials conducted in employment cases.  We should instead abide by the precedent of our Circuit that governs how employment cases are decided at the summary judgment stage.

In today's ruling against Ms. Gogel, the majority analogizes her case to cases in which the suing employee received a trial: Jones v. Flagship International, 793 F.2d 714, and Hamm v. Members of the Board of Regents, 708 F.2d 647 (11th Cir. 1983).  See Maj. Op. at 30–33.  Of course, a different standard of review applies to appeals from decisions made after trial.  And Ms. Gogel never got a trial.

74

The majority says that Jones is similar to Ms. Gogel's case and recites the Fifth Circuit's conclusion that "given Jones's particular job responsibilities, her solicitation of others to sue the company was not protected conduct for purposes of a retaliation claim." Maj. Op. at 33. However, the majority opinion relies on Jones even though the Fifth Circuit arrived at this conclusion based on the record from a three-day trial, on an appeal of the District Court's entry of a judgment after that trial. Jones, 793 F.2d at 718. Beyond that, in Jones, the Fifth Circuit was reviewing a District Court finding (again, after trial) that there was "not the slightest hint that race was even a factor in any of Flagship's employment decisions regarding Jones." Id. And the Fifth Circuit plainly stated that it would not reverse the District Court's fact finding on this point unless it was "clearly erroneous." Id. Nothing in the majority's opinion here, or anything else I am aware of, suggests that "clearly erroneous" is the proper standard for reviewing the District Court's grant of summary judgment to Kia here. Rather, we review the grant of summary judgment de novo. See Raney v. Vinson Guard Serv., Inc., 120 F.3d 1192, 1196 (11th Cir. 1997). Ms. Gogel never got a trial, and no court or jury has ever decided the facts of her dispute with Kia. The majority was mistaken when it relied on Jones's "clearly erroneous" review of a District Court's fact finding in deciding Ms. Gogel's case.

75

The majority makes the same mistake when it points to Hamm.  In doing so it relies on this court's affirmance of a fact-based ruling, made after a trial, to support its conclusion that Ms. Gogel is not entitled to a trial here.  Phyllis Hamm, like Benita Jones in her Fifth Circuit case, appealed (among other things) the District Court's dismissal of her claims against her employer after the close of her case at trial and pursuant to Federal Rule of Civil Procedure 41(b).  Hamm, 708 F.2d at 649.  The Hamm panel reviewed the District Court's findings of fact in support of this dismissal subject to "the clearly erroneous standard of review."  Id. at 650.  Here again, the majority opinion relies on a decision applying a standard of review that is not the proper one for evaluating Ms. Gogel's case.

### B.  When the majority does rely on this court's precedent governing the application of the McDonnell Douglas framework at the summary judgment stage, it does not faithfully apply that precedent.

And when the majority did look to our Circuit precedent governing summary judgment rulings in employment cases, it mistakenly applies that precedent as well. When making her prima facie case at the first step in the McDonnell Douglas framework, the employee is not charged with showing that her opposition conduct was reasonable.  See Shannon v. Bellsouth Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (holding that, in order to show a causal connection between protected conduct and retaliation, a plaintiff need only show "that the decision-makers were aware of the protected conduct, and that the protected activity and the

76

adverse actions were not wholly unrelated."). Once the employee successfully makes her prima facie showing, it falls to the employer to explain its actions. See Raney, 120 F.3d at 1196. The employer can meet its burden of showing a legitimate, nondiscriminatory reason for the adverse employment action by producing evidence that the employee's conduct fell outside the protection of Title VII. See Rollins, 868 F.2d at 401. Then, the plaintiff may, in turn, rebut this evidence by showing that the employer's reason was merely a pretext for unlawful retaliation. See Jefferies v. Harris Cnty. Cmty. Action Ass'n, 615 F.2d 1025, 1036 (5th Cir. 1980).

When discussing Ms. Gogel's retaliation claim based on her assistance to Ms. Ledbetter, the majority does not clearly or consistently apply the McDonnell Douglas framework. Instead, the majority opinion winds its way through the framework without referencing which step of the framework it is analyzing. But a careful application of the framework is essential to determining whether there is a dispute of fact at the summary judgment stage. Because the majority opinion lacks clarity in its application of the framework, I fear it will result in mistakes in future employment discrimination decisions.

As one example, the majority simply accepts Kia's invocation of the importance of "loyalty" as the last word in finding her conduct unreasonable as a matter of law. Maj. Op. at 55–56. In doing so, it overlooks the fact that Ms.

77

Gogel's conduct, the nature of her job, and Kia's motivations for terminating her were all in dispute. These are precisely the kinds of factual questions that the McDonnell Douglas framework was designed to resolve, because they go directly to whether Kia's reasons for terminating Ms. Gogel were pretextual. The Supreme Court has explained that McDonnel Douglas serves "simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." Burdine, 450 U.S. at 255–56, 101 S. Ct. at 1095. The majority opinion ignores these factual disputes. As a result, Ms. Gogel never got her "full and fair opportunity to demonstrate pretext." Id.

## II.

In this section, I will properly apply the McDonnell Douglas framework, showing how it compels the holding that Ms. Gogel came forward with sufficient evidence to create a triable issue of fact about Kia's motivations for firing her. This record demonstrates that Ms. Gogel successfully made a prima facie showing of unlawful retaliation that Kia rebutted by coming forward with a permissible, non-retaliatory reason for her dismissal. My view of the record also shows that at the third stage of the McDonnell Douglas analysis, Ms. Gogel produced sufficient evidence that Kia's reason for her dismissal was pretextual, such that it is error for the majority to grant summary judgment to Kia here.

78

## A. Ms. Gogel made a prima facie showing of retaliation, which Kia successfully rebutted.

Ms. Gogel pointed to sufficient record evidence to support a prima facie case of retaliation against her.  We know that the burden of making a prima facie case "is not onerous."  Burdine, 450 U.S. at 253, 101 S. Ct. at 1094.  Rather, at the prima facie stage a plaintiff need only "offer evidence that creates a valid inference that her employer's conduct was in fact illegal[]."  Lewis v. City of Union City, 918 F.3d 1213, 1222 n.8 (11th Cir. 2019) (en banc).

No one disputes that one reason Kia gave for firing Ms. Gogel was that she assisted Ms. Ledbetter in filing an EEOC complaint.[2]  Kia stated as much in its termination letter to Ms. Gogel, which said she was being fired in part because she "encouraged or even solicited the filing of [an EEOC charge]."  And Title VII prohibits subjecting an employee to an adverse employment action "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

---

[2] While Ms. Gogel disputes that she actually encouraged Ms. Ledbetter to seek outside counsel or file a discrimination complaint, the issue is not whether she in fact engaged in this conduct but whether Kia "in good faith believed" in the factual basis of its adverse employment action.  Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991) (quotation marks omitted); see also Heffernan v. City of Paterson, N.J., 578 U.S. ___, 136 S. Ct. 1412, 1418 (2016) (holding that an employee could challenge an employer's retaliation for protected First Amendment conduct even if that retaliation was based on the employer's factual mistake about the employee's behavior).

79

42 U.S.C. § 2000e-3(a).  Assisting fellow employees in filing EEOC charges is squarely protected activity.  See EEOC v. Total Sys. Servs., 221 F.3d 1171, 1174 (11th Cir. 2000).[3]  While Kia argues its true concern was that the assistance Ms. Gogel provided Ms. Ledbetter made Ms. Gogel ineffective in her job, that is a question for the second stage of the McDonnell Douglas framework.  At the prima facie stage, Ms. Gogel's termination letter is enough to show a causal connection between protected conduct (assisting Ms. Ledbetter) and adverse employment consequences (Ms. Gogel's discharge).  See Shannon, 292 F.3d at 716.

Kia, in turn, met its burden of rebutting Ms. Gogel's prima facie case by producing evidence that it suspended and fired her for a legitimate, nondiscriminatory reason.  See Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1265 (11th Cir. 2010).  The employer's burden, at this stage, is only "one of production—not persuasion" and it "need not persuade the court that it was actually motivated by the proffered reason."  Kidd v. Mando Am. Corp., 731 F.3d 1196, 1205 (11th Cir. 2013) (alteration adopted) (quotation marks omitted).

---

[3] The majority acknowledges that a firing on these grounds would normally give rise to a prima facie case of unlawful retaliation.  Indeed, Kia conceded at oral argument that Title VII generally prohibits firing an employee, other than a human resources employee, who engaged in this conduct.  Oral Argument at 32:57–33:38.  But the majority distinguishes Ms. Gogel's case based on Kia's asserted concern that her conduct rendered her ineffective in her role as Team Relations manager.  This fact would be appropriate to rely upon if it had ever been found by the trier of fact, like in Hamm.  Here, though, there remain significant factual disputes over both the propriety of Ms. Gogel's helping her co-worker with her EEOC charge, as well as Gogel's effectiveness as a manager.

And the majority is correct in saying that, in some instances, an employee's opposition conduct may "'so interfere[] with the performance' of her job duties 'that it renders her ineffective in the position for which she was employed'" such that it is therefore unreasonable and not protected by Title VII.  Maj. Op. at 29 (alterations adopted) (quoting Rosser, 616 F.2d at 223).

Here, Kia recognizes that the reason it fired Ms. Gogel was retaliation for protected conduct, but it says that because the conduct conflicted with Ms. Gogel's core job responsibilities it was therefore unreasonable.  The record before us supports a holding that Kia met its burden to put forward a legitimate business reason for firing Ms. Gogel.  Deposition testimony and Ms. Gogel's termination letter support Kia's claim it terminated Gogel because management believed her to be actively recruiting other employees to file lawsuits against Kia.  Kia also produced evidence that it believed this conduct to be in direct conflict with Ms. Gogel's job responsibilities.  These responsibilities, according to Kia, included working to ensure that team members did not involve third parties—by way of litigation, government organizations, and labor unions—in the resolution of workplace disputes.  I think this was sufficient for Kia to meet its burden of showing a legitimate, non-retaliatory reason for dismissing Ms. Gogel.  But I also believe there remain factual disputes about whether this reason was pretextual.

81

**B. Ms. Gogel presented sufficient evidence that Kia's reasons for dismissing her were pretextual.**

Having addressed the first two steps of the McDonnell Douglas framework, I will now outline the factual disputes raised by Ms. Gogel in her assertion that Kia's reasons for her firing were a pretext for its discrimination against her. First, there are factual disputes over the nature of her core job responsibilities and whether her conduct rendered her unable to properly perform them. These disputes go to whether Ms. Gogel's activities were "reasonable under the circumstances and were warranted by [her] employer's conduct." Payne, 654 F.2d at 1145. Second, there is a dispute over whether Ms. Gogel's inability to perform her core job responsibilities was the actual reason for her dismissal. This goes to whether the reason given for her dismissal was a pretext for unlawful retaliation. Lewis, 918 F.3d at 1221. My review shows that Ms. Gogel produced sufficient evidence to create a triable issue of fact on both of these questions at the final stage of McDonnell Douglas.

*1. Ms. Gogel's responsibilities as Team Relations manager*

First, Ms. Gogel pointed to sufficient record evidence to raise an issue of fact about whether her job involved the resolution of Title VII disputes. The majority opinion fails to recognize the factual disputes over Ms. Gogel's duties as Team Relations manager, and improperly accepts Kia's version instead. See Evans v. Stephens, 407 F. 3d 1272, 1278 (11th Cir. 2005) (en banc) (holding that "when

82

conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version" (emphasis omitted)).  It is not for judges to decide whether Ms. Gogel's conduct was reasonable.  Rather, this is a classic fact question reserved for a jury to decide.[4]

Kia hired Ms. Gogel as Team Relations manager in March 2008.  The stated purpose of the Team Relations department was to create standards and policies to support "an environment of positive team relations," develop standards around behavior, help "set a positive culture," and help employees "understand what the rules and guidelines of the workplace were."  Ms. Gogel's job responsibilities included "promot[ing] high team member morale and prevent[ing] unwelcomed activity within [Kia]."

But there is conflicting evidence over what, precisely, "prevent[ing] unwelcomed activity" entailed.  Kia says the primary role of the Team Relations department was to resolve employment disputes before employees resorted to help from an outside party, such as an attorney, labor union, or the EEOC.  If true, this would support the conclusion of the majority opinion that actively recruiting staff to participate in a discrimination lawsuit was directly contrary to Ms. Gogel's primary role.  But nothing in Ms. Gogel's job description says she was tasked with

---

[4] The Civil Rights Act of 1991 entitles a Title VII plaintiff seeking the award of compensatory or punitive damages to a jury trial.  Civil Rights Act of 1991 § 102, 42 U.S.C. § 1981a(c).

83

resolving discrimination complaints internally.  Beyond that, the parties offer conflicting testimony on this question.  Ms. Gogel testified that she understood "unwelcome activity" to mean "union organizing activity," as opposed to EEOC charges or lawsuits.  On the other hand, Arthur Williams, assistant manager of the Team Relations department, testified that the role of the Team Relations department was to "help team members stay out of legal situations and try to resolve problems prior to them getting that bad."  Latesa Bailey, Kia's Rule 30(b)(6) witness, testified that one of Ms. Gogel's roles was to avoid employment conflicts before employees resorted to outside parties.  And Robert Tyler, the Human Resources Manager at the Georgia plant, said ensuring that team members did not turn to third parties to resolve disputes was only "one of the responsibilities" of the Team Relations department.

As this review of the record makes clear, the only evidence about whether Ms. Gogel's job required her to prevent employees from resorting to litigation to resolve discrimination claims comes from contradicted deposition testimony. Thus, resolving this question requires weighing witness credibility.  And again, it is not the role of judges to pick between conflicting factual accounts at the summary judgment stage of a case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986) (stating that resolving contradictory testimony requires making credibility determination and weighing evidence, which

84

are improper at summary judgment because they "are jury functions, not those of a judge"); Evans, 407 F. 3d at 1277.  Notably, this factual dispute goes to the heart of Ms. Gogel's retaliation claim.  If preventing discrimination litigation was not part of Ms. Gogel's job, or was only incidental to it, then Kia cannot credibly claim the assistance she provided Ms. Ledbetter rendered Gogel so ineffective in her job that she was due to be fired.  Indeed, if a factfinder decided that preventing discrimination litigation was not a part of Ms. Gogel's job, this would strongly support the further finding that Kia's dismissal of Ms. Gogel was prohibited retaliation.  Rather than address this dispute, however, the majority improperly credits the deposition testimony presented by Kia over the contradictory testimony offered by Ms. Gogel.  Maj. Op at 44–47; see also id. at 50.

The majority leans heavily on Kia's claim that Ms. Gogel's job duties included assisting Kia's legal department in investigating EEOC charges.  True, the Team Relations department, which Ms. Gogel headed, occasionally conducted investigations into policy violations, attendance issues, and internal discrimination claims.  However, the parties' accounts of how important these investigations were to Ms. Gogel's job are quite different.  Ms. Gogel says that EEOC investigations were not central to her job and that her primary role was to prevent union organizing activity and ensure that Kia employees "understand what the rules and guidelines of the workplace were."  In support, she introduced evidence that the

85

Team Relations department only investigated EEOC charges at the direction of Kia legal counsel and that her role did not include the resolution of these issues. Ms. Gogel understood the Team Relations department, in contrast to the Kia Legal Department, was tasked primarily with "building . . . systems and processes to ensure fair and equitable treatment, and . . . facilitat[ing] high employee morale."

As before, the majority resolves this dispute by accepting Kia's version of the facts. And on this issue, like the first, the specific responsibilities of Ms. Gogel's job are central to resolving whether the form of opposition imputed to her—soliciting another employee to file a discrimination charge against Kia—was reasonable. See Hochstadt v. Worcester Found. for Experimental Biology, 545 F.2d 222, 230–31 (1st Cir. 1976) (holding that, in balancing the scope of reasonable opposition conduct, "[t]he requirements of the job and the tolerable limits of conduct in a particular setting must be explored"). If Ms. Gogel's job required her to assist in EEOC investigations only rarely, it would render Kia's claim that her opposition conduct made her ineffective in her position significantly less credible and more likely to be pretextual.

The majority's failure to recognize the disputes over Ms. Gogel's job requirements is particularly consequential here, where Kia has never pointed to a clear company policy that she violated. By Ms. Gogel's account, her job responsibilities were significantly different than those of the plaintiffs in Hamm,

86

Whatley v. Metropolitan Atlanta Rapid Transit Authority, 632 F.2d 1325 (5th Cir. 1980), and Jones. In those cases there was evidence that the plaintiff employees had violated either clear administrative protocols for handling discrimination complaints, see Hamm, 708 F.2d at 653; Whatley, 632 F.2d at 1326–27, or a clear obligation to represent the employer in administrative proceedings and attempt to resolve discrimination complaints in a manner favorable to the company, Jones, 793 F.2d at 716–17. Kia, in contrast, emphasizes Ms. Gogel's breach of the trust that management placed in her and the loyalty it expected from her. Whether any employee has met this general and aspirational job requirement is not readily apparent, unlike those policies violated in the cases relied upon in the majority opinion.

In the absence of a clear violation of company policy, a jury should decide whether it was reasonable for Kia to fire Ms. Gogel because her opposition conduct made her ineffective at her job. Again, it is not for judges to resolve disputes of fact about Ms. Gogel's specific job duties and responsibilities. And when the majority opinion anchors its decision on Kia's assertions that it lost "trust" in Ms. Gogel, it necessarily gives credence to one side's facts over the other. By taking over this fact-finding function, our court has reduced the scope of Title VII's protections for thousands of people whose positions in human resources

87

put them in incidental contact with EEOC complaints.[5]  This undermines the overall effectiveness of Title VII, which "depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S. Ct. 2405, 2414 (2006).  Thus, today's ruling chips away at the statute's goal of "strik[ing] at the entire spectrum of disparate treatment of men and women in employment." Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 64, 106 S. Ct. 2399, 2404 (1986) (quotation marks omitted).

### 2. Ms. Gogel's own EEOC complaint

Separate from the question of whether Ms. Gogel's opposition conduct was reasonable, there is also a dispute about whether she was fired because she filed her own EEOC charge.  As the majority acknowledges, filing an EEOC charge is protected participation conduct and is therefore not a permissible basis for an adverse employment action.  Maj. Op. at 43.  Again here, this evidence creates a triable issue of fact concerning Kia's reason for firing Ms. Gogel.  It therefore

---

[5] Amici from the Florida and Georgia chapters of the National Employment Lawyers Association point us to statistics kept by the Bureau of Labor Statistics, which now show that in 2018 there were over 625,000 "human resources specialists" and 150,000 "human resources managers" in the United States.  See Br. of Amici Curiae National Employment Lawyers Association, Florida and Georgia Chapters at 19–20; Bureau of Labor Statistics, U.S. Dep't of Labor, Occupational Outlook Handbook, "Human Resources Specialists," https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm (last visited March 19, 2020), and "Human Resource Managers," https://www.bls.gov/ooh/management/human-resources-managers.htm (last visited March 19, 2020).

provides another independent ground for reversing the grant of summary judgment.[6]

First, Ms. Gogel points to the timing of the filing of her EEOC charge and her suspension and firing. Close temporal proximity can support a finding of causation between a statutorily protected activity and an adverse employment action. See Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam). Ms. Gogel filed her first EEOC charge on November 10, 2010. Kia received it on November 22. Ms. Gogel was fired less than two months later. This evidence supports the inference that her filing of the EEOC charge, rather than concerns about her effectiveness in her position, was the real reason for her discharge. Even if the two-month gap between the filing of Ms. Gogel's

---

[6] The majority points to the holding in the original panel opinion that Ms. Gogel could not prove causation for her gender and national origin claim based solely on the fact that she filed her own EEOC charge. See Maj. Op. at 27 n.17. True, the now-vacated opinion said that, although the timing of Ms. Gogel's filing of her EEOC charge tended to show that the reason offered by Kia for her firing was pretextual, that evidence failed to show that the "real reason" was national origin or gender discrimination. See Gogel v. Kia Motors Mfg. of Ga., Inc., 904 F.3d 1226, 1239 (11th Cir. 2018) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752 (1993)). The majority fails to note, however, that the prior panel expressly said this same evidence does support Ms. Gogel's retaliation claims. Id. I have been consistent in this regard, and the en banc majority's suggestion to the contrary does not accurately reflect the history of this case.

Beyond this, the majority's statement that I "appeared" to take what they perceive as a slightly different position in the original panel opinion ignores the nature of our court's work by way of three-judge panels. I wrote the panel opinion with the active advice and assistance of the Honorable Diarmuid O'Scannlain, who was visiting our court from the U.S. Court of Appeals for the Ninth Circuit. Judge O'Scannlain and I agreed that Ms. Gogel should rightfully been given a trial based on the record we reviewed. Sadly, now that the majority of active judges on my court has vacated our opinion, I must proceed without Judge O'Scannlain's input. It is perfectly natural and proper for me to express my ideas in new ways in this en banc setting.

EEOC charge and her suspension were not alone enough to conclusively prove a causal link, there is more. Additional record evidence would allow a reasonable jury to infer that the real reason for Ms. Gogel's firing was not management concerns about the assistance she provided Ms. Ledbetter but was retaliation for filing her own EEOC charge.

This additional evidence includes evidence that Kia retaliated against others, like Mr. Tyler and Ms. Ledbetter, when they filed their own EEOC charges. The record shows Kia fired Mr. Tyler shortly after he filed his own charge. There is also evidence that Kia pressured Ms. Ledbetter to admit that Ms. Gogel encouraged her to file an EEOC charge. And there is evidence that Kia later pressured Ledbetter to drop her EEOC charges altogether. Such evidence of other retaliatory conduct—sometimes referred to as "me too" evidence—is probative of Kia's intent to retaliate against Ms. Gogel for filing her own EEOC charge. See Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1309 (11th Cir. 2016).

Ms. Gogel also submitted evidence that calls into question whether her supervisors sincerely believed she colluded to file lawsuits against Kia. Both Ms. Gogel and Ms. Ledbetter say they affirmatively denied Kia's accusations of collusion. And deposition testimony revealed that the only other co-workers interviewed before Ms. Gogel's termination were Arthur Williams and Paul Grimes, neither of whom had direct knowledge of whether Ms. Gogel and Ms.

90

Ledbetter were colluding.  As the majority correctly observes, Kia was entitled to choose between conflicting versions of events "as long as the choice [was] an honest choice,"  Total Systems Services, 221 F.3d at 1176, and Kia "in good faith believed" in the factual basis of its adverse employment action, Elrod, 939 F.2d at 1470 (quotation marks omitted).  Maj. Op. at 51–52.  But the evidence nonetheless casts doubt on whether Kia conducted a reasonable investigation of Ms. Gogel's conduct and whether it sincerely and reasonably believed she had colluded with Ms. Ledbetter.

Taken together, the evidence submitted by Ms. Gogel raises sufficient "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in Kia's reasons for terminating her that "a reasonable factfinder could find them unworthy of credence."  Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997) (quotation marks omitted).

## III.

Aside from the errors in its legal analysis, I am also troubled by the critical tone the majority opinion takes in describing Ms. Gogel.  The record before us shows that Ms. Gogel was never subject to disciplinary action of any kind from the date of her hiring at Kia until the dispute that is the subject of this lawsuit arose.  Indeed, Ms. Gogel's supervisor at Kia testified under oath that Gogel was "always very professional" and had no complaints filed against her.

91

The majority opinion seems to lose sight of the fact that the question before us is about a limited exception to Title VII's protections and that, even under Kia's account of the facts, Ms. Gogel's actions were motivated by her desire to assist a fellow employee respond to perceived gender discrimination. But for the unique requirements of Ms. Gogel's job, her conduct would undisputedly be protected under § 2000e-3. Indeed, not only is such conduct protected, it is necessary to achieve Title VII's goal of eliminating gender discrimination from the workplace. See Burlington, 548 U.S. at 67, 126 S. Ct. at 2414.

Were I in the majority, I would not have included the recitation from Kia's EEOC position statement, particularly the assertion that Ms. Gogel was "blatantly dishonest when explicitly questioned about Diana Ledbetter." Maj. Op. at 19. As outlined above, there is a genuine factual dispute over the nature and extent of Ms. Gogel's assistance to Ms. Ledbetter. There is therefore no basis for this Court to include language indicating that Ms. Gogel was dishonest. Ms. Gogel's credibility is not at issue in a motion for summary judgment. See Anderson, 477 U.S. at 255, 106 S. Ct. at 2513. And we should honor the fact that Kia has not argued that it fired Ms. Gogel because she was suspected of lying to her supervisors.

I also would not have included quotations from the deposition testimony of Ms. Gogel's co-workers which disparaged her work methods. Maj. Op. at 44–46. As judges, we were never a part of Ms. Gogel's workplace and it was not our

92

charge to make findings about how she conducted herself there.  We are therefore in no position to judge the credibility of the accounts her co-workers gave about her.  Repeating these disparaging accounts in a judicial opinion can do permanent harm to Ms. Gogel's reputation when she has never been provided any opportunity to subject those negative accounts to adversarial testing.  It is the role of the courts to receive complaints from people who, like Andrea Gogel, believe they lost their jobs for reasons the law prohibits.  Plaintiffs should not fear having their reputations tarnished by judges reviewing legal questions, simply because they presented their grievance to the courts.

## IV.

The majority opinion misapplies the McDonnell Douglas burden-shifting framework and improperly resolves disputes over important facts at the summary judgment stage.  Because these issues should be resolved at trial, I respectfully dissent.

93

ROSENBAUM, Circuit Judge, joined by MARTIN and JILL PRYOR, Circuit Judges, dissenting:

Like decades of our precedent, the Majority Opinion recognizes a valid concern that employers *legitimately* demand employee loyalty where those employers attempt in good faith to comply with Title VII. But the Majority Opinion goes too far. It goes off the rails when it ignores the rest of what our precedent requires; that is, today's ruling effectively immunizes employers' *illegitimate* demands for loyalty when those employers consistently discriminate and retaliate against their employees and obstruct any efforts to comply with Title VII.

To do this, the Majority Opinion creates a new rule that departs from our longstanding precedent and essentially bans any employee with any type of Title VII-related responsibilities from so much as discussing Title VII's EEOC process with any other employee. And if the employee with Title VII-related duties violates this new rule, she risks losing all personal Title VII rights. Remarkably, as this case shows when we consider all the evidence (not just that cherry-picked by the Majority Opinion), the Majority Opinion's new rule applies even if the employer has affirmatively acted in bad faith and set up its internal Title VII process for the purpose of frustrating Title VII's very goals.

Title VII was enacted, in relevant part, to "seek[] a workplace where individuals are not discriminated against because of their . . . gender-based status."

94

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006).  And the

"primary purpose" of Title VII's antiretaliation provision is "maintaining unfettered

access to statutory remedial mechanisms." *Id.* at 64 (cleaned up).  Far from securing

"unfettered access," the Majority Opinion's new rule ensures human-resources

employees will never speak one word about the law's "statutory remedial

mechanisms" to other employees, under even the most sustained discriminatory

circumstances.  And if they do, the Majority Opinion's new rule permits employers

to fire those human-resources employees with complete Title VII impunity.

Considering that, as of 2018, there were roughly 775,000 human-resources

employees nationwide[1]—and these now-silenced employees are often the

employees most familiar with Title VII's protections—the Majority Opinion's new

rule has the potential to inflict a devastating blow to the Title VII rights of both

human-resources employees and the employees they serve.

True, for those employers who follow both the letter and spirit of the law in

trying to foster a business environment free from discrimination, the Majority

Opinion does not change anything.  But for those employers who treat their Title VII

obligations as an obstacle to avoid and discharge their responsibilities with bad faith,

---

[1] This number comes from the U.S. Bureau of Labor Statistics and its *Occupational Outlook Handbook*.  According to that source, in 2018, the most recent year for which these statistics appear to be available, there were 625,700 human-resources-specialist positions in the United States, https://www.bls.gov/ooh/business-and-financial/human-resources-specialists.htm (last visited May 5, 2020), plus 152,100 human-resources-manager positions in the United States, https://www.bls.gov/ooh/management/human-resources-managers.htm (last visited May 5, 2020).

95

this is a welcome development. The Majority Opinion's new rule turns Title VII's purpose on its head and rewards employers who intentionally violate the law. That obviously is wrong.

Here, we see a demonstration of how the Majority Opinion's new rule plays out when the employer undertakes its so-called Title VII compliance efforts in bad faith.[2] For the nearly three years Andrea Gogel worked at KMMG, she must have felt as if she were working in a house of sexist horrors. Almost immediately after Gogel began working for KMMG as its Team Relations Manager—a job that required her to deal in some ways with Title VII complaints[3]—she witnessed KMMG's discriminatory treatment of its female employees. Indeed, Gogel herself experienced some of this unending sexist behavior firsthand. She also received official complaints about it from her fellow employees, both male and female.

As part of her job, Gogel brought these issues to Randy Jackson, KMMG's Director of Human Resources and Administration and the one person who should

---

[2] Because this case was decided on a motion for summary judgment, this dissent construes the evidence and draws all reasonable inferences in the light most favorable to Gogel as the nonmoving party. *Williamson v. Brevard Cty.*, 928 F.3d 1296, 1304 (11th Cir. 2019). As a result, the facts set forth here may or may not be the real facts. Were the case to proceed to trial, it would be up to a jury to decide whether to accept the evidence supporting Gogel's version of the facts.

[3] Judge Martin points out that a dispute of material fact exists on this record over precisely what Gogel's duties entailed. *See* Martin Dissent at Section II.B.1. I agree, but since Judge Martin has already addressed this point, my dissent assumes KMMG's assertion that a primary part of Gogel's job was to resolve employment disputes before employees resorted to help from an outside party, such as an attorney, labor union, or the EEOC. Even with this assumption, as I show below, the record still contains disputes of material fact that preclude summary judgment.

have helped her.  His responses ranged from useless (doing nothing) to intentionally destructive (instructing Gogel to embrace KMMG's "[p]atriarchal" way of doing things or retaliating against Gogel).  Through this system of reporting, KMMG was able to appear—through Gogel—to offer an internal Title VII process while, in reality, avoiding compliance with Title VII.  Looks can be deceiving.  In short, KMMG and Jackson used Gogel as a mechanism to frustrate Title VII compliance.

The Majority Opinion fails to arrive at this conclusion, which should have been inevitable, because it makes two significant errors—each of which independently dooms its analysis.

First, the Majority Opinion fails to heed our binding precedent.  It does not actually apply the factors in the *Rollins*[4] balancing test when it evaluates whether Gogel's alleged advice to Ledbetter to file an EEOC charge constituted protected activity on this record.  Instead, the Majority Opinion simply identifies the test and refers to it to deny Gogel's claim.

But the test requires much more than that.  It demands that we "balanc[e] the purpose of [Title VII] and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Rollins*, 868 F.2d at 400-01.  The Majority Opinion affords zero consideration to, let alone discussion of, the first part of this

---

[4] *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 401 (11th Cir. 1989).

balancing test:   the purpose of Title VII to "eliminat[e] discrimination in employment."  *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1139 (5th Cir. Unit A Sept. 4, 1981).[5]  It also skimps on its analysis of "the need to protect individuals asserting their [Title VII] rights."  And it utterly disregards the requirement in the third part of the balancing test that an employer's demands for loyalty, cooperation, and a generally productive work environment be "legitimate." A "balancing test" that automatically credits the employer's "demands for loyalty, cooperation and a generally productive work environment" (regardless of legitimacy) and accounts for nothing else is no balancing test at all; it's a rubber stamp.  If the Majority Opinion had correctly applied the balancing test, it would have concluded that, under our binding precedent and on this record, a jury must decide whether Gogel's alleged advice to Ledbetter to file an EEOC claim constituted protected activity.

Second, even if we overlook the Majority Opinion's failure to follow our long-established precedent that requires actual application of the *Rollins* balancing test to determine when otherwise-protected Title VII conduct becomes unprotected, the Majority Opinion errs in another important way that independently requires vacatur of summary judgment here.  It inexplicably insists that Gogel's retaliation claim was

---

[5] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions of the "old Fifth" Circuit handed down prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

98

based solely on her filing of an EEOC claim. So it refuses to consider in its analysis her nearly three years of opposing discrimination at KMMG and the retaliation she suffered during that period as a result. It does this even though Gogel has consistently argued her opposition conduct as part of her retaliation claim.

As a result of the Majority Opinion's insistence on analyzing a mere fraction of Gogel's retaliation claim, the Majority Opinion fails to consider, in the context Gogel actually alleged, Randy Jackson's suspect claim that he fired Gogel because he believed she had solicited Diana Ledbetter to file suit against KMMG. Unsurprisingly, ignoring a litany of crucial facts leads the Majority Opinion to conclude incorrectly that no issue of material fact exists as to whether KMMG's proffered reason for firing Gogel was pretextual. And that leads the Majority Opinion to erroneously affirm the grant of summary judgment for KMMG.

I divide my discussion of the Majority Opinion's errors into three substantive parts. To provide a context for demonstrating the problems of each of the Majority Opinion's mistakes and because the Majority Opinion's picked-over version of the facts fails to capture the rampant discrimination and retaliation that KMMG regularly engaged in, Section I sets forth relevant facts. In Section II, I properly apply the *Rollins* test to the facts of this case, showing that, under our binding precedent, a jury should be permitted to determine whether, on this record, Gogel's alleged solicitation of Ledbetter constituted protected activity under Title VII for

99

which Gogel could not be terminated.  Finally, Section III assumes *arguendo* that

Gogel's alleged solicitation of Ledbetter could never qualify as protected activity.

It then shows that, in any case, the Majority Opinion incorrectly concluded that

Gogel did not identify a genuine issue of material fact about the reason KMMG fired

her.

## I.

Before I set forth the numerous important facts that the Majority Opinion

conveniently ignores, I pause to emphasize the standard on a motion for summary

judgment.  We are, of course, required to accept the evidence in the light most

favorable to the non-moving party, *see Williamson v. Brevard Cty.*, 928 F.3d 1296,

1304 (11th Cir. 2019)—here, Gogel.  We are also required to draw all reasonable

inferences in favor of the non-moving party.  *See id.*  Notably, the Majority Opinion

does not contest any of the facts below that, employing this summary-judgment

standard, I have drawn from the record here.[6]  That means that we must account for

them in our summary-judgment analysis.

To give just a little taste of what women at KMMG had to contend with, I

recount some of the conditions Gogel and those who complained to her experienced:

---

[6] Nonetheless, I include pincite references to the evidence of record to allow any interested reader to evaluate for herself the evidence on which I rely in my recitation of the facts.  References are to the district-court ECF number and the CM/ECF-imprinted page number.  For evidence from deposition transcripts, I include both the CM/ECF-imprinted page number and a parenthetical reference to the page numbers of the deposition transcript, since four deposition transcript pages appear on each CM/ECF-numbered page.

Two men reported to Gogel that women who were deemed "not pretty" were hidden, and young female professionals who were viewed as "pretty" were forced to pretend they were receptionists when Kia VIPs visited. ECF No. 117 at 45(180)-46(181). In fact, a woman was dismissed from the front-desk receptionist position "because she was considered unattractive." ECF No. 101-1 at 10. Women security officers were also "hid[den]" when Kia VIPs visited. *Id.* at 6; ECF No. 119 at 43(168). Jackson did not try to deny what was happening when Gogel expressed concern about it. To the contrary, he told her that appearances were very important to Kia. ECF No. 101-1 at 15.

Some employees were also told that "only young pretty women can be hired in [G]eneral [A]ffairs." ECF No. 117 at 30(119). KMMG employee Diana Ledbetter, who was in General Affairs, complained to Gogel about that and sought to transfer out of that section. Jackson had a chance to rectify the situation when Gogel told him about it. But once again, he failed to do so: he just laughed and said a decision had already been made (presumably, regarding the denial of Ledbetter's transfer request). *Id.*

Women, including Gogel, were excluded from meetings that, based on their job duties, they should have been a part of and that Gogel's male subordinates took part in. *Id.* at 40(160), 41(161), 154; ECF No. 101-1 at 11. In fact, Jackson told Bob Tyler, KMMG's Head of Department for Human Resources and Team Relations,

101

that he did not want Gogel to attend termination-review meetings, even though that was part of her job as Team Relations Manager. ECF No. 121 at 35(140); ECF No. 117 at 113. Even when Gogel was included in meetings, Jackson instructed her not to "speak at all." But the men in the room, including Gogel's male subordinates, were permitted to speak. ECF No. 117 at 43 (171-72), 44(174-76); ECF No. 121 at 34(136)-35(137-140).

Gogel perceived herself to be viewed by KMMG as a "token" female manager, and she was directed to make herself "prominent in photographs [taken] whenever [she] was invited to a meeting that [she] typically would otherwise have not been invited to." ECF No. 117 at 40(159); ECF No. 101-1 at 12.

Kevin Kim, KMMG's senior manager for Human Relations, Training, and Organizational Development, instructed Rayla Smoot, the assistant manager of Training and Organizational Development, to use sexist materials to train employees on "gender differences." ECF No. 117 at 59(233-35); ECF No. 115 at 23(87-88). In particular, the training content showed a man and a woman. ECF No. 117 at 59(233-35). A cartoon bubble over the man's head said he was thinking about sex, and the bubble over the woman's head indicated she was thinking about "shallow, stereotypical kinds of things," such as her clothes and what she was going to wear. *Id.* When Smoot complained to Gogel, Gogel told her not to use the materials. *Id.*

102

Ledbetter complained to Gogel of reasons to believe the president of Kia was having an intimate relationship with a subordinate, who was also a manager. *Id.* at 43(169); ECF No. 101-2 at 2. She was not the only one who thought so; rather, "[t]he alleged affair was a highly rumored topic." ECF No. 119 at 99. If the allegations were true, that relationship was contrary to KMMG's written anti-harassment policy, which "prohibit[ed] romantic or sexual relationships between any KMMG member of management and any subordinate Team Member." *See* ECF No. 93-11 at 4. KMMG's policy explained that, "given the uneven balance of power within such relationships, consent by the Team Member is suspect and may be viewed by others or, at a later date, by the Team Member himself or herself as having been given as a result of coercion or intimidation." *Id.* at 5. Among other things, Gogel was concerned that the subordinate "could be involved in something that she wasn't consenting to, because there was such a dramatic difference in the levels [of responsibility between the president and the subordinate]." ECF No. 117 at 43(170). She was also worried that there might be a *quid pro quo* relationship between the president and the subordinate. ECF No. 101-1 at 4-5.

But when Gogel discussed the matter with Jackson and sought to investigate it to ensure that KMMG was complying with Title VII, Jackson prohibited her from doing so. *Id.*; *see also* ECF No. 117 at 31(121); ECF No. 101-2 at 2-3. Gogel was not the only one to express concern to Jackson about the alleged relationship; Tyler

103

did as well.  ECF No. 121 at 32(127-28); ECF No. 101-2 at 2-3.  As with Gogel, Jackson also instructed Tyler not to investigate the allegations.  ECF No. 121 at 32(127-28); ECF No. 101-2 at 2-3.

A few weeks later, Kim (KMMG's senior manager for Human Relations, Training, and Organizational Development) instructed Gogel to go ahead and conduct a secret investigation into the subordinate—not the president—and not to tell Jackson.  ECF No. 117 at 31(121-22).  Soon after that, though, Kim demanded Gogel "stop the investigation, do not gather any more information, and destroy all information related to anything that [she] had done." *Id.* at 31(122).  Kim's attitude towards Gogel then changed for the worse.  *Id.*

When KMMG reorganized its management structure in 2009, every male manager where no higher level of management existed in the home office was made a head of department.  *Id.* at 32(126).  But Gogel, the only woman who was a manager where a higher level of management did not exist in the home office, was not similarly promoted.  *Id.* at 32(125-26).  Jackson made the decision not to elevate Gogel.  ECF No. 115 at 35(134).

Gogel met with Jackson and told him she felt that she was being treated differently because of her gender.  ECF No. 117 at 30(117).  When she asked why she had not been made Head of Team Relations, Jackson told her that Tyler had been made Head of both the Team Relations and Human Resources Departments and that

104

two Heads of Department were not necessary for these two different departments. *Id.* at 32 (126-28). He also told her it was a matter of timing. *Id.* Gogel questioned these rationales in 2009 and 2010 and explained why she thought they were suspect. *Id.* at 47(185-86). Jackson responded by asking Gogel whether she thought her prior employer would take her back. *Id.* Gogel also thought the concerns she reported about the alleged relationship between the company's president and a subordinate contributed to KMMG's decision not to make her a head of department. *Id.* at 31(123).

Throughout Gogel's employment with KMMG, there were fourteen employees who served in the two highest levels of local management. Not a single one was a woman. *Id.* at 117-18, 61(244).

Meanwhile, Tyler, the newly designated Head of Department for both Human Resources and Team Relations in the reorganization, was instructed by Jackson to revise his favorable ratings of Gogel to make them less favorable. ECF No. 121 at 22(87). So even though Tyler believed Gogel should have been promoted to senior manager and Tyler was the one to sign Gogel's appraisal, he had to follow Jackson's instructions and give Gogel lower ratings with which he disagreed. *Id.* at 22(87-88), 24(95-96), 25(97-98). As it turned out, Tyler explained, the ratings were supposed to be used to determine who should be promoted to senior manager, but in fact, the decisions were made without reference to the ratings. The ratings were simply

105

created to appear consistent with the promotion decisions. *Id.* at 22(87-88)-23(89-92). More smoke and mirrors.

Gogel was fired from KMMG in January 2011, and KMMG replaced her as manager of Team Relations with Arthur Williams, Gogel's former subordinate.[7] Later, KMMG made Williams Head of Department for Team Relations and appointed a separate Head of Department for Human Resources, notwithstanding that its rationale for not promoting Gogel had been that only one Head of Department for both departments was needed. ECF No. 123 at 41(159-60)-43(165-66).

Besides these incidents, while Gogel was still employed with KMMG, KMMG repeatedly asked "illegal, non-job related questions during and after pre-employment interviews and the selection/recruitment process." ECF No. 117 at 154. Among others, these questions concerned age and marital status. *Id.* Though these actions were brought to the attention of Jackson and KMMG's executive team, the behavior continued. *Id.* at 155; ECF No. 118 at 1. And those KMMG employees who attempted to correct the situation were met with "a systematic approach to discredit and harass" them. ECF No. 117 at 155.

---

[7] During the period when Gogel supervised Williams, according to Williams's deposition testimony, Williams commented that a black dress Gogel had worn to the funeral for a colleague's father was "skimpy" and was not "appropriate." ECF No. 123 at 80(315-16). On another occasion, Williams told Gogel she "dressed like a 'Filipino prostitute,'" based on the "high-heeled shoes" she was wearing. *Id*. at 80(316)-81(320). Williams also thought Gogel "took the side of women." *Id.* at 80(313).

106

When a server at a KMMG event was pregnant, Ledbetter, who had planned the event, was instructed to have the server removed. *Id.* at 51(201). Ledbetter complained to Gogel's then-subordinate, Williams. *Id.*

At least two women resigned from KMMG "largely as a result of the general mistreatment of females and gender-based discrimination." *Id.* at 156. Before they resigned, Team Relations brought the women's concerns to KMMG, but "Team Relations was not permitted to conduct prompt, thorough investigations." *Id.* Indeed, as far back as August 14, 2009, Gogel emailed KMMG's Human Relations and advised, "Some women feel singled out and humiliated—not sure if goal is to get rid of them or just 'put them in their place.'" ECF No. 120 at 121.

When a woman returned from maternity leave, Richard Park, the senior legal manager, told her she was a bad mother for coming back to work. ECF No. 117 at 60(238); *see also* ECF No. 93-6 at 2. The woman reported the incident to Gogel. ECF No. 117 at 60(239). Gogel felt unable to address the situation because of the senior legal manager's rank in comparison to her own, so she directed the woman to Jackson and Tyler. *Id.* Jackson spoke to Park and the woman about the incident and decided that the woman had misconstrued Park's statements. ECF No. 115 at 37(143-44). The woman ultimately resigned, citing the statement from Park as a reason why. ECF No. 93-6 at 2. Upon resigning, she further explained that once she returned from maternity leave, she "didn't have a true position." *Id.* Rather, she

107

"was assigned mundane tasks that were left behind and things no one else wanted, in addition to unchallenging tasks." *Id.*  The woman opined that KMMG's company culture was "if you are a woman you will only climb so far in the organization, and if you are a woman with children your place is at home." *Id.*

Two male managers in the company's stamping group—one of whom was the group's senior manager—complained to Gogel that a female manager in stamping was being treated poorly by a subordinate because she was a woman.  ECF No. 117 at 46(182-84).  According to these men, the male subordinate was extremely disrespectful to the female manager. *Id.*  Among other incidents, he told the woman she was nothing but a young girl and commented on the fact that she wore makeup. *Id.*  Gogel told Jackson and Kim that the male subordinate needed to be disciplined. *Id.*  But all Kim did was "coach" the subordinate. *Id.*  Gogel "voiced concerns [to Jackson and Kim] about the decision being tremendously different than . . . what the facts indicated." *Id.*  The woman wound up leaving KMMG and explained, "The work environment was not favorable for women in management position, which had a significant impact on me."  ECF No. 115 at 123.

At one point, Jackson told Gogel that she had a "responsibility" to support the "'[p]atriarchal' culture" at KMMG.  ECF No. 101-1 at 18.  Jackson also instructed Gogel that she had a "responsibility" to assist in identifying "how old people are from their résumés" because "it was important that . . . people not be older than the

108

people reporting to them." ECF No. 117 at 65(258). Gogel felt at this point that KMMG had no interest or desire in "making sure that [it was] operating the way that was consistent with American laws." *Id.* at 65(259).

The list of discriminatory conduct goes on and on.

Finally, though, Gogel had enough. She and other managers contributed to a document called the Report of Concerns, which catalogued a wide variety of problems they perceived at KMMG. *Id.* at 145-58. Among these problems, the Report of Concerns noted significant Title VII compliance issues, including, among others, many of the conditions discussed in this dissent, as well as "[d]irectives . . . to exclude females . . . from employment opportunities" and KMMG's denial of "recommendations for employment for female salaried professionals based on their gender."[8] *Id.* at 154; *see also* ECF No. 122 at 100. The managers provided this document to Jackson for action. ECF No. 118 at 1.

On October 14, 2010, Jackson held a meeting with Gogel to ask her questions about the Report of Concerns, which, among other things, summarized concerns Gogel had expressed to Jackson throughout 2009 and 2010. ECF No. 118 at 1; ECF No. 101-1 at 8-9. At the meeting, Gogel requested "reassurance that [her] comments would not lead to further retaliation." ECF No. 118 at 1; *see also* ECF No. 101-1 at

---

[8] The Report of Concerns also alleged numerous other violations of the law that are not relevant to this case. *See* ECF No. 117 at 152-57.

10. She then reiterated the concerns about sex discrimination she had previously expressed to Jackson. ECF No. 101-1 at 8-9. During the meeting, Gogel answered questions for roughly 45 minutes, until Jackson said he needed to go to another meeting, so they had to "wrap up." ECF No. 118 at 1. Gogel said "there was a lot more, but nothing that [she] had not complained to [Jackson] about previously." *Id.* Nevertheless, Gogel agreed to answer any questions Jackson may have had. *Id.*

But Gogel did not hear back from Jackson. *Id.* Instead, Tyler told her on November 3 that Jackson's "investigation into the issues raised was closed, and regarding concerns that [Gogel] had raised, it was difficult to address issues that [Gogel] would not give information about." *Id.* Gogel found this response "remarkable," since Jackson had ended the October 14 meeting and Gogel had agreed to answer any further questions he had. *Id.* She commented to Jackson that "[b]eing questioned about complaints by one of the individuals implicated . . . is, at best, poor investigative practices, but at worst, and for [Gogel], very intimidating." *Id.*

Finally, after nearly three years of witnessing "other women experiencing significant damage to their careers and [seeing] the same thing coming for [her]self, and [she] couldn't protect them and [she] couldn't protect [herself], and the people that [she] reported to either could not or would not protect [them]," Gogel decided she had to seek assistance from the Equal Employment Opportunity Commission.

110

ECF No. 117 at 52(208).  So on November 10, 2010, Gogel filed a complaint of discrimination with the EEOC.  *Id.* at 137.  Among other things, she alleged she had been discriminated against "based on [her] sex (female)."  *Id.*

Gogel, who had worked in human resources at other companies for seventeen uneventful years before joining KMMG, *see id.* at 110, explained her feelings on filing the charge:  "I never thought I would have to do something like that . . . .  I had done everything within the rules and guidelines of everything I knew and everything that I had ever been taught, as well as the policies of the company I worked for.  And I was sitting there completing an EEOC charge."  *Id.* at 39(153).

The EEOC received the complaint on November 18, 2010.  *Id.* at 137.  Later, during the course of this litigation, KMMG's Rule 30(b)(6) witness acknowledged that employees with a "manager role in HR" have a right to file their own EEOC charges.  ECF No. 115 at 52(201).  Nevertheless, she asserted that "[i]t's beyond my belief that someone in those positions would file a charge."  *Id.*

Returning to the events as they unfolded, on November 23, 2010, instead of handling Gogel's filing of the EEOC charge discreetly, Jackson spoke about Gogel's EEOC complaint "in a very loud way" in the "open office environment."  *Id.* at 50(198-99).  Not surprisingly, "so many" other KMMG employees overheard Jackson's "comments and conversations regarding [Gogel's] EEOC charge."  *Id.*

111

Among those who heard about Gogel's EEOC charge as a result of Jackson's behavior was Ledbetter. ECF No. 101-1 at 14; ECF No. 117 at 50(198-99). Ledbetter then asked Gogel about it and inquired whether Gogel had chosen an attorney yet. *Id.*

Meanwhile, while Jackson was busy talking about Gogel's EEOC complaint in front of anyone and everyone who would listen, on December 3, KMMG required Gogel to sign an agreement that, among other things, prohibited her from "discuss[ing] [her] EEOC charge or similar claims against [KMMG] with Team Members." ECF No. 118 at 9. When Gogel asked for time for her lawyer to review the document, Jackson sent her home until she agreed to sign the document, which she ultimately did on December 6. ECF No. 117 at 53(210); ECF No. 115 at 41(157-58).

Then, on December 10, 2010, Diana Ledbetter filed her own charge of discrimination against KMMG. ECF No. 120 at 134-35. Among other things, Ledbetter asserted in her charge that she had been "required to engage in conduct that males at my level have not been required to do." *Id*. She provided examples, noting that she was made "to practice saying 'welcome Chairman' in front of male executives while holding flowers," since she was required to perform this task when high-ranking male executives visited the plant; she was "forced to pour wine" for these same male executives; and she was "called a Geisha at work." *Id.* According

112

to Ledbetter's charge, "[s]ome male managers t[old] [her] they [were] sorry for what [she] ha[d] to do and other male managers laugh[ed] in [her] face." *Id.*

Ledbetter later explained that she "knew [Gogel] and [Tyler] were powerless to help [her], and . . . Jackson wasn't helping [her] either." ECF No. 101-2 at 3. So she concluded that "[t]he only choice [she] had . . . was to file a Charge with the EEOC." *Id.* Ledbetter stated that Gogel "did not encourage [her] nor solicit [her] to get an attorney and sue the company or file an EEOC charge." *Id*. at 3-4. Rather, Ledbetter insisted she "decided for [her]self" to file an EEOC charge. In fact, Ledbetter explained, she "had no intention of suing KMMG." *Id.* at 4. Rather, she "just wanted KMMG to listen to [her] complaints . . . ." *Id.*

On January 7, 2011, after KMMG's Christmas break, Jackson and Charlie Webb, a KMMG lawyer, met with Gogel. *See* ECF No. 117 at 66(261). They asked Gogel whether she had colluded with Ledbetter, and Gogel denied that she had done so. *Id.* They also asked her about a particular meeting she had had with Ledbetter and whether she had discussed suing KMMG at that time. *Id.* at 66(262). Gogel had notes from the meeting that showed that the discussion was not about lawsuits but rather concerned providing boxed lunches or different alternatives to allow KMMG employees to eat lunch while the cafeteria was shut down during the Christmas break. *Id.* According to Gogel, at the January 7 meeting, she "adequately explained everything [Jackson and Webb] were asking [her] about. And it was in

113

no way inappropriate." *Id.* at 66(263).  Nevertheless, at the end of the meeting, Webb asked Jackson, "'What do you want to do?'  And [Jackson] said, 'Well, just to be safe, why don't we go ahead as planned.'"  *Id.*  So Gogel was escorted from the building and placed on administrative leave.  *Id.* at 66(263-64).

On January 19, 2011, Jackson—Gogel's supervisor who, for the last nearly three years, had failed to take action against the sexism at KMMG and had retaliated against Gogel for continuing to seek a remedy for the situation—sent Gogel a letter terminating her employment.  ECF No. 118 at 26-27.  The letter said that "[b]ased on [KMMG's] investigation, one could conclude that [Gogel] encouraged or even solicited the filing of [Ledbetter's discrimination] charge."  *Id.*  It continued, "At the very least, there is an appearance of a conflict of interest sufficient to cause the Company to lose confidence in the loyalty and trust that is required by [Gogel's] position."  *Id.*  Notably, the letter did not state that Jackson or KMMG had actually concluded that Gogel "encouraged or even solicited the filing of [Ledbetter's discrimination] charge."

Soon after, Ledbetter called Williams, who had since assumed Gogel's role after she was fired (he was later formally appointed in April 2011 to replace Gogel). Ledbetter asked him whether she was going to be fired.  ECF No. 101-2 at 4; ECF No. 114 at 24(89); ECF No. 123 at 56(220)-57(224).  Williams met Ledbetter on January 26, 2011, at a Wal-Mart to discuss her fear of retaliation.  ECF No. 101-2 at

114

4-5; ECF No. 123 at 67(264), 142-44.  He asked Ledbetter about her EEOC charge and "basically told [her] [she] needed to admit that [Tyler] and [Gogel] encouraged [her] to make the decision to file a Charge, and if [she] did so, then all would be forgiven against [her]."  ECF No. 101-2 at 5.  Ledbetter refused "because it was not true."  *Id.*  Then Williams responded that Ledbetter "was young and impressionable and maybe [she] didn't know what [she] was doing, which [Ledbetter] found insulting."  *Id.*  He continued to pressure Ledbetter "to drop [her] [EEOC] Charge, and to say [she] made a mistake."  *Id.*  Ledbetter refused, noting that no one at KMMG had told her that they would "help rectify [her] complaints."  *Id.*

According to Williams's own notes of his conversation with Ledbetter, he also told Ledbetter, "You got a hell of a way of showing you care.  Most of us could come up [with] something better than what you did," referring to her filing of an EEOC charge.  ECF No. 123 at 70(273-74).  When Ledbetter expressed concern that she had already faced retaliation at work, Williams responded, "Diana[,] come on[.] You filed vs. the Company.  What do you expect?  Do you think you are to be the golden child after doing something like that?"  *Id.* at 70(276), 143.  Then Williams asked, "Where's the loyalty?  You came to Kia without an automotive background. They worked with you to become an [assistant manager] in General Affairs in a very short time, and this is what you do!"  *Id.*  For emphasis, Williams repeated, "[A]ny

115

new [team member] would be happy to have reached the level you have in such a short time, and this is what you do." *Id.* at 71(278), 143.

Meanwhile, after Gogel's termination, Gogel filed a new charge with the EEOC on February 8, 2011. ECF No. 118 at 28. It alleged that KMMG "retaliated against [her] due to [her] opposition to acts made unlawful by Title VII." *Id.*

In 2012, Ledbetter again sought to be transferred out of General Affairs. ECF No. 101-2 at 6. Jackson and Latesa Bailey, then the Head of Department for Human Resources, "[e]ssentially . . . told [her] if [she] dropped [her] EEOC Charge, then [she] would have a better chance of being transferred, so [she] withdrew [her] EEOC Charge." *Id.* After she did that, on October 12, 2012, Jackson told her that she could be transferred out of General Affairs only by applying for and being selected for an opening for an assistant-manager position, but, of course, there were no openings. *Id.* Ledbetter said that "[t]he entire time [her] EEOC Charge was pending, [she] was the 'black sheep' at KMMG. [She] was encouraged by management to withdraw [her] Charge. [She] withdrew [her] Charge to get back in good favor with the company, and hopefully receive the transfer [she] had been requesting." *Id.* Finally, nine months later, in June 2013, when she still had not received the transfer she had sought since she was hired in 2008, Ledbetter resigned from KMMG. *Id.*

116

## II.

I begin my analysis by assuming, for the purposes of this section only, that Jackson fired Gogel because he truly believed she had solicited Ledbetter to file an EEOC charge.  Even with that assumption, under our binding case law, summary judgment should not have been granted.  That is so because an issue of material fact exists over whether, on this particular record, Gogel's alleged solicitation of Ledbetter nonetheless qualifies as protected activity.

**A. Under our binding precedent, we must apply a balancing test that, among other components, requires consideration of the legitimacy of the employer's demands for loyalty**

As the Majority Opinion notes, our predecessor Court has held that an employee's otherwise protected Title VII conduct may "so interfere[] with the performance of [her] job that it renders [her] ineffective in the position for which [she] was employed."  Maj. Op. at 29 (quoting *Rosser v. Laborers' Int'l Union of N. Am., Local No. 438*, 616 F.2d 221, 223 (5th Cir. 1980)).  In that case, the conduct no longer qualifies as protected.  *See id.*

But contrary to the Majority Opinion's suggestion, *see* Maj. Op. at 41–42, this quotation from *Rosser* does not state a standalone test in and of itself.  Even *Rosser* suggests that to determine the point at which opposition conduct crosses the *Rosser* threshold, we must engage in a balancing of sorts.  *See id.* ("We believe that on balance, this is just such an instance.").

117

And so it is not surprising that we expressly identified the proper considerations for balancing more than thirty years ago in *Rollins*, 868 F.2d at 401. There, we explained that we determine when otherwise-protected conduct becomes unreasonable in the eyes of Title VII (and therefore unprotected) by "balancing the purpose of [Title VII] and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment." *Id*. So it is *Rollins* that governs the determination of when an employee's otherwise-protected Title VII conduct becomes unprotected.

The Majority Opinion tries to avoid this awkward fact by claiming that the *Rollins* test pertains to only otherwise-protected Title VII conduct that "does not interfere with an employee's job duties [but] is nonetheless so disruptive that it does not qualify for protection." Maj. Op. at 35. Not so. The *Rollins* balancing test applies whenever an employer asserts that otherwise-protected Title VII conduct has become unprotected—regardless of the reason. *Rollins* itself, as well as other case law, makes this clear.

*First*, by its terms, the *Rollins* balancing test governs all cases where a court must determine whether "the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice" is "reasonable." 868 F.2d at 401. Advising another employee of her right under Title VII to file an EEOC

118

charge—even if the employee giving the advice is a human-resources employee— is a "manner in which an employee expresses her opposition to an allegedly discriminatory practice." That is, after all, why it is called opposition conduct. So when an employer raises a question about whether a human-resources employee's activity in that regard remains protected, the answer is necessarily dictated by the *Rollins* test.

*Second*, as I noted in the last paragraph, under *Rollins*, only "reasonable" otherwise-protected Title VII conduct remains protected. 868 F.2d at 401. And according to *Rollins*, "reasonable" conduct is "protected conduct [that is not] so disruptive or inappropriate as to fall outside [Title VII's] protection." *Id.* (citing, among other cases, *Payne*, 654 F.2d at 1142). Based on *Rollins*'s citation of *Payne* for that proposition, we know that the *Rollins* Court included activity that "so interferes with the performance of [the employee's] job that it renders [the employee] ineffective in the position for which [the employee] was employed," *Payne*, 654 F.2d at 1142, within the meaning of conduct that is overly "disruptive or inappropriate," *Rollins*, 868 F.2d at 401. In other words, the *Rollins* Court understood that the *Rollins* balancing test applies to conduct that the employer claims interfered enough with the employee's duties that it made the employee ineffective in her position.

119

*Third*, *Rollins* tells us in yet another way that its balancing test applies equally to employees whose otherwise-protected activities are unreasonably disruptive and employees whose otherwise-protected activities may interfere with their job duties: *Rollins* observes that "in applying [the *Rollins*] balancing test, our approach is consistent with those of our sister circuits which have addressed the issue." 868 F.2d at 401. *Rollins* then cites, among other cases, *Jones v. Flagship International*, 793 F.2d 714, 728 (5th Cir. 1986), *cert. denied*, 479 U.S. 1065 (1987), as having "addressed the issue" and applied a similar balancing test to resolve it.

As the Majority Opinion notes, *see* Maj. Op. at 32–33, the "issue" in *Jones* was whether the actions of the plaintiff there, in soliciting another employee to file a discrimination charge against the employer and inviting a different employee to join in a lawsuit against the employer, so interfered with the plaintiff's duties as legal counsel and manager of equal-opportunity-employment programs that it rendered her ineffective for the position. And *Rollins* views the conduct in *Jones*—otherwise-protected conduct that the employer claims so interferes with the employee's job duties so as to render her ineffective for her position and thereby render the conduct unprotected—and the conduct in *Rollins*—otherwise-protected conduct that the employer claims is so disruptive as to become unprotected—as raising the same "issue" and therefore justifying the use of the same balancing approach. *Rollins*, 868 F.2d at 401.

120

*Fourth*, the Majority Opinion's insistence that the isolated statement from *Rosser* it quotes represents some type of independent test for protected conduct is not even supported by the cases the Majority Opinion cites. I have already explained that even *Rosser* anticipates some type of "balanc[ing]." *See Rosser*, 616 F.2d at 224. And *Hamm v. Members of the Board of Regents of the State of Florida*, 708 F.2d 647 (11th Cir. 1983)—which the Majority Opinion also relies upon and which predates *Rollins*[9]—applies what *Rollins* later incorporated into its balancing test as the legitimacy consideration. *See* Maj. Op. at 30–31.

In particular, in *Hamm*, we held that the employee had not engaged in protected activity only after we observed that no evidence "show[ed] that any of the defendants ever directed the plaintiff to overlook claims of discrimination by employees or to cease bringing such claims to their attention." 708 F.2d at 654. In other words, we accounted in our analysis not only for the employee's job responsibilities but also for whether the employer's demands of loyalty and

---

[9] All three of the cases the Majority Opinion relies upon for the proposition that the *Rollins* test does not apply to otherwise-protected conduct that the employer asserts so interferes with the employee's duties that it renders her ineffective for her position—that is, *Rosser*, *Hamm*, and *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. 1980)—were issued in the years before we decided *Rollins*. So of course they do not cite or rely on the *Rollins* balancing test. But any fair reading of *Rollins* shows that it represents the next step in our Circuit's development of the law governing the determination of when otherwise-protected Title VII conduct loses that protected status. Indeed, since *Rollins* was issued, we have cited *Rosser* only once in a precedential case—in the now-vacated panel opinion in this case. But there, as in this dissent, we explained that *Rosser* is tempered by the *Rollins* balancing test.

121

cooperation were legitimate.  And we did so by pointing to the absence of facts in *Hamm* that are so glaringly present here.

To sum up, the Majority Opinion's treatment of *Rosser* ignores the unmistakable development of protected-conduct analysis in the Eleventh Circuit.  As a result, the Majority Opinion necessarily applies a flawed framework.

Plus, we got it right when we developed the *Rollins* balancing test to determine whether otherwise-protected Title VII conduct of any kind becomes unprotected.  Both the text of Title VII and the rule of law require consideration of, among other things, the legitimacy of the employer's demands for loyalty.

First, the text:  Title VII, by its terms, makes it illegal for "an employer" to retaliate against an employee "because [she] has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a).  The one thing that all opinions in this case agree on is that advising a colleague about filing a Title VII charge generally constitutes protected Title VII activity.  The Majority Opinion concludes it does not here only because of Gogel's duties.

But Title VII was never meant to wholesale exclude from its protections under every circumstance human-resources employees who mention Title VII statutory remedies to other employees.  We know this because, in enacting Title VII, Congress specifically exempted from its coverage six categories of employees.  *See* 42 U.S.C. §§ 2000e-1(a), 2000e-2(e), 2000e-2(f), 2000e-1(b).  Human-resources employees

122

are not among these. As we emphasized just a few months ago, "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *Pitch v. United States*, 953 F.3d 1226, 1234 (11th Cir. 2020) (*en banc*) (citation and internal quotation marks omitted). Here, the Majority Opinion points to no contrary legislative intent, and I am likewise aware of none. Yet the Majority Opinion nonetheless reads this unwritten exclusion into Title VII.

Second, the rule of law: the Majority Opinion's approach rewards bad-faith efforts to frustrate Title VII. It allows the most contumacious employer to fire its human-resources employees with impunity if they so much as make a fellow employee aware of Title VII's remedies—no matter how outrageous and extended the employer's bad-faith efforts to obstruct Title VII in the workplace. In contrast, an employee who brings a Title VII claim must have a "good faith, reasonable belief that the challenged practices violate Title VII." *Rollins*, 868 F.2d at 400. For good reason. The legitimacy of the law is at stake. We should not permit any party to use the courts to bless a one-sided interpretation of the law that allows those who refuse in bad faith to comply with the law's requirements to benefit from their very refusal to comply. Because *Rollins*'s balancing test accounts for this very important interest in the rule of law, it—and not the rule the Majority Opinion adopts today—correctly

123

sets forth the appropriate considerations for determining whether otherwise-protected conduct remains so.

## B. The Majority Opinion does not conduct the balancing that *Rollins* requires

Here, the Majority Opinion does none of what *Rollins* requires. It never even mentions the purpose of Title VII in its analysis. And it conveniently omits consideration of the numerous instances of Title VII opposition conduct that Gogel claimed to have participated in, so it fails to properly account for "the need to protect [Gogel's] asserti[on] [of her Title VII] rights." Compounding these errors, the Majority Opinion simply assumes that KMMG's demands for loyalty in this case are "legitimate," without evaluating them against Gogel's claims that KMMG cavalierly and regularly violated Title VII and inevitably and repeatedly retaliated against those who complained.

So in the end, the Majority Opinion's "balancing" consists of only blindly believing KMMG's demands for loyalty were "legitimate" in this case. Towards that end, the Majority Opinion takes into account only Gogel's duties that required her to attempt "to internalize the resolution of any complaint and thereby avoid, if possible, the external resolution of that complaint, such as the filing of an EEOC charge and a subsequent lawsuit," and KMMG's assertion that Gogel advised Ledbetter to file an EEOC claim. *See* Maj. Op. at 44. With a "balance" stacked like

124

that in KMMG's favor, it's no wonder the Majority Opinion concludes that Gogel failed to show she engaged in protected activity.

### C. Actually applying the *Rollins* balancing test compels the conclusion that Gogel's evidence establishes a material issue of fact concerning whether her activity constituted Title VII protected conduct in the circumstances here

But if we consider what the *Rollins* balancing test actually requires, it is clear that a jury should have been permitted to determine whether Gogel's alleged solicitation of Ledbetter was protected activity. *Rollins*'s balancing test finds its origins in *Payne*. *See Rollins*, 868 F.2d at 401 (citing *Payne*, 654 F.2d at 1145).

In *Payne*, our predecessor Court explained that "[w]hen the [employer] offers evidence that plaintiff's conduct [that otherwise would have been protected conduct under Title VII] was [not protected activity under Title VII in the particular instance], and therefore provided the [employer] with a nondiscriminatory reason for its employment action, the plaintiff is entitled to an opportunity to show that his activities were reasonable under the circumstances and were warranted by the employer's conduct." *Payne*, 654 F.2d at 1145. Indeed, unless the plaintiff's otherwise-protected conduct is so clearly beyond the pale of protected activity that we can determine it is unprotected "as a matter of law," "the *fact finder* must have an opportunity to hear evidence, to balance the competing considerations, and to reach a conclusion as to the reasonableness of the conduct." *Id.* at 1145-46

125

(emphasis added).  In other words, when an employer alleges that an employee's duties render otherwise-protected conduct unprotected, whether that is actually so on a given record is a question of material fact for the jury to resolve, unless the plaintiff's conduct necessarily, as a matter of law, qualifies on the particular record as unprotected.

The *Rollins* balancing-test factors tell us how to make that assessment.  And when we apply those factors here, we cannot find that Gogel's conduct, under the circumstances she alleges KMMG created in this case, is, as a matter of law, unprotected activity under Title VII.  To conduct this analysis correctly, we begin by identifying the content of the three factors to be balanced:  "the purpose of the statute," "the need to protect individuals asserting their rights thereunder," and the "employer's legitimate demands for loyalty, cooperation and a generally productive work environment."  *Rollins*, 868 F.2d at 401.

With respect to "the purpose of the statute," Gogel proceeds under Title VII's retaliation prohibition.  To understand Title VII's antiretaliation provision, we must begin with Title VII's antidiscrimination provision.  That provision "seeks a workplace where individuals are not discriminated against because of their . . . gender-based status."  *Burlington N.*, 548 U.S. at 63.  Title VII's antiretaliation provision, in turn, "seeks to secure that primary objective [of the antidiscrimination provision] by preventing an employer from interfering (through retaliation) with an

126

employee's efforts to secure or advance enforcement of [Title VII's] basic guarantees." *Id.* So the Supreme Court has explained that Title VII's antiretaliation provision's "primary purpose" is "maintaining unfettered access to statutory remedial mechanisms." *Id.* at 64 (cleaned up). This "primary purpose" obviously becomes especially important where, as Gogel alleges here, an employer refuses to internally address an employee's discrimination claims and even engages in affirmative acts to obstruct Title VII compliance.

As for "the need to protect individuals asserting their [Title VII] rights," Gogel exercised both her opposition and participation rights under Title VII. In Section I of this dissent, I have catalogued many ways Gogel opposed sex-based discriminatory conduct at KMMG, as well as the way Gogel participated in the EEOC process herself. In conducting the *Rollins* balancing, we must consider all this conduct. And we must account for it against the background of the *Rollins* test's first consideration—the purpose of the statute.

So we must look at Gogel's efforts to secure "a workplace where individuals are not discriminated against because of their . . . gender-based status." *See Burlington N.*, 548 U.S. at 63. When we do that, we see that for nearly three years, Gogel engaged in effort after effort through KMMG, and through Jackson in particular, to remedy rampant sex discrimination—all to worse than no avail. Instead of achieving parity for women, Gogel's antidiscrimination efforts brought

127

her retaliation.  Finally, after witnessing "other women experiencing significant damage to their careers and [seeing] the same thing coming for [her]self, and [she] couldn't protect them and [she] couldn't protect [herself], and the people that [she] reported to either could not or would not protect [them]," Gogel decided she had to seek assistance from the Equal Employment Opportunity Commission.  ECF No. 117 at 52(208).  Put simply, Gogel filed an EEOC charge and, assuming KMMG's version of the story, advised Ledbetter to do the same, only after KMMG fully frustrated Gogel's nearly three years of efforts to obtain KMMG's compliance with Title VII.

We consider this evidence, too, when we evaluate "the employer's legitimate demands for loyalty, cooperation and a generally productive work environment."  As the formulation of this factor suggests, it requires us to identify KMMG's demands for loyalty, cooperation, and a generally productive work environment and assess whether, in the context of the facts Gogel alleges, they were "legitimate."

KMMG claims that it fired Gogel because "one could conclude that [she] encouraged or even solicited" Ledbetter to file her EEOC charge and that "there [was] an appearance of a conflict of interest sufficient to cause [KMMG] to lose confidence in the loyalty and trust that [was] required by [her] position."  ECF No. 120 at 138.  And as Jackson put it, "the role of the Team Relations Manager is not

128

to solicit, encourage other team members to file a lawsuit.  It's to encourage and problem solve to prevent team members from filing a lawsuit."  *Id.* at 70(273).

It is certainly legitimate and reasonable for a company that seeks in good faith to comply with Title VII to expect its professionals who are responsible for assisting in the handling of Title VII complaints to avoid suggesting to employees that they file EEOC charges.

But that, of course, assumes that the company makes a good-faith effort to comply with the law under Title VII.[10]  It should go without saying that a company's demands for "loyalty" and "cooperation" are not "legitimate" if the company uses its Title VII professionals to subvert the law and to quash legitimate discrimination complaints without remedying them.  In that environment, a company's demands for "loyalty" and "cooperation" must not be blindly deferred to.  And nothing in our precedent suggests otherwise.  Rather, as the *Rollins* test itself indicates, if a company, in bad faith, routinely frustrates its Title VII professional's efforts to resolve other employees' potentially legitimate discrimination complaints within the company, at some point it becomes reasonable for that Title VII professional, whose

---

[10] The Majority Opinion finds this notion to be "grudging."  Maj. Op. at 38.  It's not clear to me what is "grudging" about the recognition that an employer legitimately expects loyalty from its employees when it comes to Title VII claims only when that employer does not act in bad faith and does not affirmatively try to obstruct Title VII compliance.

ultimate fidelity must be to the law, to direct a complaining employee to statutory avenues outside the company for possible relief.

On this record, a jury should have had the opportunity to evaluate whether that point had come at the time that Gogel allegedly advised Ledbetter to file an EEOC charge.  Otherwise, an employee who finds herself in this position has only one choice if she wants to keep her job:  to continue assisting the company in running roughshod over its employees' rights, in violation of the law.  Under *Payne* and its progeny, that is plainly wrong.

**D. Because the Majority Opinion does not abrogate *Payne*, the Majority Opinion is bound by *Payne*'s holding that the determination of whether otherwise-protected conduct remains protected conduct on a given record presents an issue of fact, unless it is clear as a matter of law that the conduct is unprotected**

The Majority Opinion makes no secret that this part of our precedent gives it a headache; it tries everything in the book to rid itself of *Payne* and its clear meaning. But not one of the Majority Opinion's efforts to render itself *Payne*-free succeeds.

*First*, the Majority Opinion attempts to characterize the noted quotations from *Payne* as "arguably dicta."  *See* Maj. Op. at 41 & 41 n.20.  As the Majority Opinion's use of the modifier "arguably" begins to betray, though, the *Payne* quotations are nothing of the sort.

In *Payne*, the employer, for the first time on appeal, asserted that the employee's conduct was not "protected activity" under Title VII.  654 F.2d at 1144.

130

Observing that it could consider the employer's contention for the first time on appeal if the employer raised a question of law, the Old Fifth Circuit set about determining whether the question of whether an employee's conduct fails to qualify as protected Title VII activity raises an issue of law or fact. *Id.* at 1145. The Court concluded that "[a]t least where conduct is not unprotected as a matter of law," the issue raises a question of fact. *Id.* at 1146. For that reason, our predecessor Court held that it could not consider for the first time on appeal whether the employee's conduct constituted protected activity. *Id.*

Obviously, the holding that whether conduct is protected activity states a question of fact, not law, was critical to the Court's holding that it could not address the employer's argument brought for the first time on appeal. By definition, then, it was not dicta. *See United States v. Kaley*, 579 F.3d 1246, 1253 n.10 (11th Cir. 2009) ("[D]icta is defined as those portions of an opinion that are not necessary to deciding the case then before us." (citation and internal quotation marks omitted)).

*Second*, the Majority Opinion engages in a half-hearted effort to materially distinguish *Payne* from Gogel's case. *See* Maj. Op. at 41. In support of this effort, in its entirety, the Majority Opinion asserts, "In contrast with Gogel, there was no contention in *Payne* that, had he been rehired, the plaintiff's picketing activity while not employed with the company would so interfere with the performance of his job

131

duties as a seasonal laborer that it would render him ineffective in that position . . . ." Maj. Op. at 41.

But *Payne* stands for only the proposition that whether an employee's conduct is protected presents a question of fact unless, as a matter of law, it is clear that the employee's conduct is not protected. To go that next step and actually determine whether an employee's Title VII conduct, in the circumstances of a given case, is unprotected as a matter of law, we must employ *Rollins*'s balancing test (as I have done above). Because the Majority Opinion fails to do that, its effort to distinguish *Payne* is a lot like deciding the winner of a team relay race by looking at only the first leg of the race. Instead of applying the multipart *Rollins* balancing test that governs the protected-activity determination, the Majority Opinion's doomed effort to distinguish *Payne* considers only KMMG's demands for loyalty and just assumes they were "legitimate." That analysis ignores the legitimacy inquiry, as well as *Rollins*'s other two factors—the purpose of Title VII and the employee's interest in engaging in protected activity. The Majority Opinion cannot distinguish *Payne* by refusing to apply the governing *Rollins* test to Gogel's evidence.

*Third*, the Majority Opinion mischaracterizes my description of *Payne*'s rule as being "that summary judgment could never be warranted on the question whether particular conduct was protected." Maj. Op. at 41. That simply isn't so. Indeed, as I have noted multiple times in this dissent, it is clear that *Payne* authorizes summary

132

judgment when the employee's otherwise-protected conduct, as a matter of law, does not qualify on a given record as protected Title VII conduct.  654 F.2d at 1145-46.  The problem for the Majority Opinion here is that that is not the case.

*Finally*, apparently sensing that its other efforts to kill the *Payne* precedent cannot carry the day, the Majority Opinion resorts to the tired, old parade of horribles, claiming that I "argue[] that whenever a plaintiff HR manager with job responsibilities like Gogel's abandons those responsibilities because she finds fault with the employer's decisions and is then terminated, the balancing test . . . requires that the judicial decision-maker determine whether the manager should nonetheless be given a pass and allowed to remain in her job."  Maj. Op. at 38–39.  This contention of the Majority Opinion's is so misleading that it's hard to know where to begin.

So I will start where the Majority Opinion does.  It calls the application of *Payne*'s rule and *Rollins*'s longstanding balancing test an "exception" I "craft[ed]" to the Majority Opinion's rule and my "new test."  Maj. Op. at 38, 42.  If that's how the Majority Opinion wants to characterize strict application of our binding precedent as it is written, I'll freely concede I'm guilty.

Regardless of the nomenclature, my so-called "new test" and "craft[ed]" "exception" simply apply *Rollins*'s balancing test.  And when doing so reveals that we cannot conclude that, under the particular circumstances of this case, Gogel's

133

alleged conduct was unprotected as a matter of law, I merely recognize pursuant to *Payne*'s rule that the issue is one of fact that we must leave to the factfinder.

By contrast, as I have explained, the Majority Opinion makes no effort whatsoever to actually apply *Rollins*'s considerations of whether the employer's demands for loyalty are legitimate. Nor does it consider the employee's interest in engaging in Title VII protected activity or the purposes of Title VII's retaliation provision.

Even the most attentive reader who engages in the deepest scouring of the Majority Opinion in search of these things comes up empty-handed. Instead, ignoring ample evidence to the contrary, the Majority Opinion just assumes that KMMG's demands for loyalty were "legitimate" and ends its analysis there. Applying that "test," it's no wonder the Majority Opinion reaches the conclusion it does. But make no mistake about it—the Majority Opinion does not apply our precedent. Not only does the Majority Opinion's one-factor "test" violate *Rollins*, it also transgresses the most basic principle of summary judgment: we view the evidence in the light most favorable to the non-moving party.

Here, Gogel presented a mountain of evidence that, if believed, clearly demonstrates that KMMG acted in bad faith when it came to Title VII. To briefly review, according to that evidence, Jackson, KMMG's chief administrative officer, instructed Gogel (a human-resources official who, according to KMMG, was

134

responsible for addressing Title VII issues) not to investigate reported violations of KMMG's own Title VII policy; then, after she began to do so because Kim told her to investigate (but only the subordinate, not Kia's president), Kim backtracked and told her to destroy all records of her investigation; and Jackson consistently directed Gogel to accept and even embrace KMMG's regular violations of Title VII, including things like asking people's ages, encouraging a "[p]atriarchal" hierarchy, hiding the supposedly "unattractive" female employees, and on and on.

Despite all this evidence, the Majority Opinion's legal analysis mentions not a single word about it. Instead, the Majority Opinion completely ignores the evidence and simply chooses to credit KMMG's claim that its demands for loyalty, under the circumstances, were "legitimate." Perhaps that is because it is impossible to conclude, as a matter of law, that KMMG's demands for loyalty, under the circumstances, were "legitimate," if we credit Gogel's evidence of KMMG's bad faith, as we must under the summary-judgment standard.

Pouring more rain on the Majority Opinion's parade of horribles is the fact that our own precedent shows that there is nothing unmanageable about actually applying the *Rollins* balancing-test components. As I have noted, *Hamm*, which the Majority Opinion relies on to suggest that we do not consider the legitimacy of the employer's demands for loyalty, *see* Maj. Op. at 30–31, shows that, in fact, we do,

135

and we have—even since before *Rollins* neatly bundled the balancing considerations into its test.

Nearly forty years have passed since *Hamm.* And in that time, it does not appear that we have had a single case (other than this one)—precedential or not—where a human-resources employee attempted to demonstrate that her otherwise-protected Title VII conduct survived *Rollins*'s balancing test on summary judgment because of significant evidence that the employer acted in bad faith and flouted its Title VII responsibilities. That readily demonstrates, contrary to the Majority Opinion's argument, *see* Maj. Op. at 38–39, that adhering to the *Rollins* balancing test does not result in a free-for-all for human-resources employees where they will necessarily be able to avoid summary judgment and go to trial. Rather, when faced with an employer's demands for loyalty, a human-resources employee who engages in otherwise-protected conduct may survive summary judgment only by presenting sufficient evidence to create a material issue of fact over whether the employer's demands for loyalty were legitimate. And as *Hamm* demonstrates, that can be done if the evidence, construed in the employee's favor, shows that the employer exercised bad faith in applying its Title VII obligations and actively worked to circumvent the law's protections.

136

**E. The Majority Opinion's refusal to apply *Rollins* and *Payne* rewards and emboldens employers who, in bad faith, routinely obstruct Title VII compliance**

Here, the Majority Opinion never actually conducts the balancing that *Rollins* requires. So it incorrectly fails to recognize *Payne*'s requirement that a jury must determine whether, on this record, Gogel engaged in protected activity when she allegedly advised Ledbetter of her right to file an EEOC charge. As a result, the Majority Opinion further aids KMMG in skirting the boundaries of Title VII yet again.

Worse yet, the Majority Opinion's new rule essentially ensures that Gogel and thousands of human-resources personnel like her must forgo the protections of Title VII if they dare to mention Title VII's statutory remedies to other employees—no matter how much bad faith their employers may engage in when it comes to Title VII compliance.

*Payne*, *Rollins*, and their progeny understood the problems inherent in the Majority Opinion's one-factor test. That's why they imposed a balancing test that accounts for the purpose of Title VII, the employee's interests in exercising her Title VII rights, and the employer's *legitimate* interests in loyalty and that defers to the factfinder in all but the few cases where this balancing concludes, as a matter of law, that the employee's activities were not protected. In reaching a contrary conclusion

137

today, the Majority Opinion forsakes Title VII and our binding precedent.  I cannot agree.

## III.

Not only does the Majority Opinion fail to follow our substantive precedent on Title VII, it also ignores Gogel's actual claim.  Indeed, even if we assume that a human-resources employee's advice to another employee about her Title VII options could never constitute protected Title VII conduct on any record, this section demonstrates that Gogel submitted sufficient evidence that, when viewed in the light most favorable to her as the non-moving party, establishes a genuine issue of material fact concerning whether KMMG's stated reason for firing Gogel was pretextual.

As I have mentioned, the Majority Opinion fails to analyze Gogel's actual retaliation claim.  In fact, the Majority Opinion admits that in its analysis of Gogel's alleged retaliation claim, it does not account for Gogel's opposition conduct and instead considers only her participation conduct in the form of filing her November 10, 2010, EEOC charge.  *See* Maj. Op at 28 n.18 ("Our dissenting colleague . . . faults us for limiting ourselves to consideration of Gogel's filing of the first EEOC Charge and for failing to consider whether one could infer that Kia fired Gogel because of her prior complaints concerning perceived mistreatment of herself and others.").  But Gogel's Title VII retaliation claim is based on the premise that

138

KMMG retaliated against her for both her opposition conduct and her filing of an EEOC charge. Gogel's complaint and her briefing in the district court and here plainly show that.[11]

Yet despite Gogel's clear and repeated assertions that she based her retaliation claim on both participation and opposition conduct, the Majority Opinion insists that Gogel alleged KMMG retaliated against her solely because she filed her November 10, 2010, EEOC charge. *See* Maj. Op. at 28 n.18. Not acknowledging and analyzing

---

[11] First, Gogel's EEOC retaliation charge asserted that she believed she had been "retaliated against ***due to [her] opposition*** to acts made unlawful by Title VII . . . ." ECF No. 118 at 27 (emphasis added). Second, when she filed her complaint in this case, Gogel alleged in her retaliation claim that KMMG's "retaliation against [Gogel] was on account of her participation in the EEOC charge filing process ***and because of her opposition to discrimination*** . . . ." ECF No. 19 at ¶ 63 (emphasis added). Third, Gogel continued to press her retaliation claim based on both participation and opposition conduct when, in the district court, she opposed KMMG's motion for summary judgment. In her brief in opposition, for example, Gogel argued both that she "[e]ngaged in [p]rotected [e]xpression [u]nder Title VII [w]hen [s]he [f]iled an EEOC [c]harge . . ." and that ***she "[e]ngaged in [p]rotected [e]xpression [u]nder Title VII [w]hen [s]he . . . [m]ade [o]ther [c]omplaints on [b]ehalf of [o]thers*** . . . ." ECF No. 101 at 6, 7 (emphasis added); *see also id.* at 10-12 (discussing Gogel's complaints to Jackson about not being made a head of department), 13-17 (discussing some of Gogel's numerous complaints to Jackson about discriminatory conduct against Gogel and others), 21 (describing her "protected activities" as "***informal complaints of discrimination to Jackson*** and the filing [of] an EEOC Charge") (emphasis added). And fourth, Gogel maintained this position in her *en banc* briefing, again contending that "she engaged in protected conduct when she: ***internally complained*** in September and October 2010 about personally suffering from discrimination in the workplace [as] well as ***opposing the continued discriminatory treatment of other employees***; filed a Charge of Discrimination with the EEOC . . . ." Gogel's Initial Br. at 24 (emphasis added). She further specified in her brief what she meant by her opposition conduct with a summary of numerous complaints she had made to Jackson about discrimination against her and others at KMMG. *See id.* at 4-11. Referring to her filing of an EEOC charge after her history of opposing KMMG's sexist treatment, Gogel explained her argument as follows: "[a] jury could find her protected speech was the straw that broke the camel's back . . . ." *Id.* at 25. In other words, Gogel argued that her termination was retaliation for a long list of opposition activity Gogel engaged in, capped off by her participation conduct in filing her EEOC charge.

the retaliation claim that Gogel actually brought[12] certainly makes it easier for the Majority Opinion to find that summary judgment was appropriate here. But the Majority Opinion's wishful interpretation of Gogel's retaliation claim does not comport with reality. And analyzing Gogel's actual retaliation claim requires vacatur of summary judgment.

Beginning with Gogel's *prima facie* case, as I have noted, Gogel alleged that she engaged in Title VII-protected opposition and participation activity. I have previously described some of that activity in Section I, *supra*. For convenience, I briefly summarize that evidence: Gogel asserted that during her nearly three-year tenure with KMMG, she opposed discriminatory practices against her when she complained to Jackson that KMMG and Jackson discriminated against her on the basis of sex by refusing to elevate her to head of department (even though it elevated all similarly situated men), by downwardly adjusting her evaluation, by excluding her from meetings her duties required she attend, by prohibiting her from speaking at meetings (where her male subordinates were permitted to talk), by prohibiting her from investigating complaints of discrimination (when doing so was part of her job),

---

[12] In the second part of footnote 18 of the Majority Opinion, in three sentences, the Majority Opinion alternatively dismisses the notion that Gogel's opposition conduct would change the analysis. That alternative "analysis" improperly assumes that KMMG actually believed that Gogel had solicited Ledbetter to sue it. *See* Maj. Op. at 28 n.18. But as this section of the dissent shows, that is the very claim over which a material dispute of fact exists.

and by otherwise rendering her impotent to address discrimination at KMMG (though her duties anticipated that she do so).

Gogel further explained that she consistently opposed discriminatory practices against others at KMMG by continually reporting them to Jackson. As Gogel described things, she complained time after time to Jackson about the pervasive acts of sex discrimination against women at KMMG, some of which I've summarized in Section I, *supra*.

Only after trying to achieve internal resolution with KMMG of her personal complaints and the complaints of others for nearly three years and seeing no interest on KMMG's part in abiding by Title VII did Gogel determine that her only alternative was to file a charge with the EEOC. All this conduct—both the opposition and the participation activity—qualifies under Title VII as protected activity. *See* 42 U.S.C. § 2000e-3(a).

Turning to the second component of a *prima facie* case of retaliation (the employer took adverse action against the plaintiff), for Gogel's efforts to remedy allegedly rampant discrimination at KMMG, Gogel endured Jackson's repeated denials of her requests to be elevated to head of department, Jackson's decisions to exclude her from meetings, Jackson's instruction to her that she not speak at meetings, Jackson's suggestion that she try to reobtain her former employment, Jackson's open announcement that she had filed an EEOC claim, Jackson's

141

placement of Gogel on administrative leave, and ultimately, Jackson's termination of Gogel's employment at KMMG. This evidence satisfies the requirement that Gogel demonstrate KMMG took adverse action against her.[13]

As for the third prong of Gogel's *prima facie* case, Gogel identified sufficient evidence to establish a causal connection between her protected activity and her termination. Gogel alleged that, even before KMMG terminated her, throughout her employment, KMMG changed the terms of her employment in response to her complaints. For example, Jackson's comment to Gogel about getting her "old job" back came only after Gogel complained about her treatment and about the treatment of other women at KMMG. Similarly, though Jackson told her in 2009 that she would be promoted to head of department for Team Relations in 2010, she wasn't after she complained that only men were promoted. And she was suspended and fired after Jackson loudly complained about her EEOC charge in the office. A

---

[13] Remarkably, to combat the premise that KMMG retaliated against Gogel for filing her EEOC charge, the Majority Opinion suggests repeatedly that KMMG gave Gogel a "discretionary bonus" on December 22, 2010. *See* Maj. Op. at 12, 26, 43. The December 22, 2010, bonus was KMMG's Christmas bonus, which it gave to *all employees in a predetermined amount, based on the employee's position and months of service*. *See* ECF No. 117 at 142. Indeed, the letter accompanying the bonus stated, "In support of recognizing the results all team members have achieved on 'One Team, One System,' I am proud to announce a *Success Sharing Award* to all team members actively employed with KMMG through December 28, 2010." *Id.* I suppose KMMG could have withheld that bonus, but then Gogel would have been the only employee not to receive it. And that would have provided yet another basis for Gogel's retaliation claim. Contrary to the Majority Opinion's suggestion, KMMG's decision to refrain from retaliating against Gogel in this one instance—by giving her a bonus it was literally giving every other employee—does not somehow prove that KMMG did not retaliate against Gogel. Nor does it otherwise absolve KMMG of its retaliatory actions, viewed in the light most favorable to Gogel.

142

reasonable jury could infer from this evidence that Jackson was angry about Gogel's opposition and participation activity.

Then, just six weeks after Jackson learned of her EEOC charge, on January 7, 2011, Jackson suspended Gogel.[14]  He ultimately fired her less than two weeks later, on January 19, 2011.  The totality of these facts creates a reasonable inference that "the protected activity and the adverse actions were not wholly unrelated," which is all that the first step of the *McDonnell Douglas* framework requires.  *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017) (citation and internal quotation marks omitted).

When we look at all these components of a *prima facie* case of retaliation, we must conclude that Gogel satisfied her burden to make such a showing.

So the burden of production then shifted to KMMG to come forward with a legitimate, nondiscriminatory reason for taking adverse action against Gogel. KMMG asserted that it suspended and fired Gogel because, as Jackson stated in his letter ending Gogel's employment, "Based on our investigation, one could conclude that [she] encouraged or even solicited [Ledbetter's] filing of [her EEOC] charge. At the very least, there is an appearance of a conflict of interest sufficient to cause the Company to lose confidence in the loyalty and trust that is required by [Gogel's]

---

[14] And considering that KMMG closed its facility from December 23, 2010, through January 3, 2011, ECF No. 85 at 6, the period between Jackson's learning of Gogel's claim and Jackson's suspension of Gogel spanned only just over four work weeks.

position." ECF No. 118 at 26. Assuming for purposes of this section (as the Majority Opinion (incorrectly) concludes) that the actions that Jackson attributed to Gogel in his dismissal letter could never qualify as protected conduct by a human-resources employee, Jackson's statement satisfied KMMG's burden of production.

As a result, Gogel was entitled to receive "a full and fair opportunity to demonstrate that [KMMG's] proffered reason was merely a pretext to mask [retaliation]." *Bryant v. Jones*, 575 F.3d 1281, 1308 (11th Cir. 2009). Here, in support of her assertion of pretext, Gogel submitted evidence that a reasonable jury could find suggests that Jackson and KMMG did not truly believe that Gogel had "solicited" Ledbetter to file her EEOC charge when it fired Gogel for that stated reason.

Besides the evidence I mentioned above that betrays Jackson's anger with Gogel for opposing discriminatory practices at KMMG and for filing her own EEOC charge, Jackson claimed that he conducted an investigation into whether Gogel had advised Ledbetter to file an EEOC charge, based on statements Williams made to him on January 4, 2011. ECF No. 85 at 6. But the entirety of Jackson's "investigation" consisted of reviewing statements taken from Williams and Paul

144

Grimes on January 5, 2011.  *See* ECF No. 120 at 73(285-87); ECF No. 119 at 98; ECF No. 123 at 153.[15]

Before I address this point further, I want to be clear:  contrary to the Majority Opinion's contention, my point is not that Jackson conducted an investigation that was not sufficiently "thorough."  *See* Maj. Op. at 55 n.25.  Rather, for the reasons I describe below, a reasonable jury could conclude on this record that Jackson never set out to and did not actually conduct a *bona fide* investigation at all but rather went through the motions to provide cover for his real reason for firing Gogel:  her Title VII opposition and participation conduct.  Another matter of appearances.

At the time of the "investigation," more than ten people other than Williams and Grimes worked in Team Relations—not to mention the numerous other KMMG employees who worked outside Team Relations.  *See* ECF No. 117 at 21(83-84). Yet Jackson and KMMG spoke with none of them to check on Williams's and Grimes's allegations.

---

[15] In his deposition, Jackson also claimed that he based his decision on "e-mails" and "checking . . . with [Gogel's] computer and [Ledbetter's] computer."  ECF No. 120 at 73(287). He provided no further elaboration.  And curiously, among the numerous exhibits KMMG filed in support of its motion for summary judgment—including Jackson's deposition and some selected exhibits to his deposition—it did not file any emails or documentation from Gogel's or Ledbetter's computer that in any way suggested that Gogel had ever discussed EEOC charges with Ledbetter, let alone advised her to file an EEOC charge.  Because we must view the record in the light most favorable to Gogel, and because Jackson provides no indication of what was allegedly in these mysterious and missing emails, and because I cannot review supposed emails and computer records that do not appear to exist, I do not consider them.

In the run-of-the-mine case, this fact might not be unusual.  But it turns out that Jackson was "close" with Grimes and Williams.  ECF No. 119 at 30(115-16); *Id.* at 99.  In fact, Jackson socialized outside work with Williams and Grimes, who themselves shared an apartment from 2008 until after Gogel was fired.  *Id.* at 30(115-16), 99, 25(96).  Not only that, but after he fired Gogel, Jackson made Williams the Acting Manager of Team Relations, then the Manager of Team Relations, and ultimately, the Head of Department of Team Relations.  He similarly elevated Grimes to Manager of Team Relations when he made Williams the Head of Department.  Plus, Williams testified that he was always concerned about being fired by Jackson and did not want to make Jackson mad because "[t]hat wouldn't be healthy."  ECF No. 123 at 47(183).

Williams's suggestion that Jackson could be vengeful when angry further raises questions about Jackson's true motivation in terminating Gogel.  But aside from that, in short, Williams and Grimes had many reasons to go along with Jackson and any scheme he might have cooked up.

And Williams's related actions also show that he was not in pursuit of the truth.  Williams was the one who met with Ledbetter soon after Gogel's dismissal to try to get Ledbetter to falsely implicate Gogel in encouraging Ledbetter to file her EEOC charge.  When Ledbetter refused, Williams essentially bullied her, calling

146

Ledbetter disloyal to KMMG, in a bid to convince Ledbetter to drop her EEOC charge.

Yet other reasons that involve Williams could cause a reasonable jury to find Jackson's story suspect.  Williams told Jackson in January 2011 that Ledbetter had confided in him several times, starting as early as the beginning of November 2010, that Gogel was the "ringleader" for Gogel's, Tyler's, and Ledbetter's decision to take legal action, that Gogel and Tyler frequently met with and encouraged Ledbetter to sue KMMG, and the three coordinated by using the same lawyer.[16]  Maj. Op. at 13–14; *see also* ECF No. 123 at 151 ¶¶ 28, 29; *id.* at 153.  Williams also testified that, as a member of Team Relations, one of his responsibilities was to help team members "stay out of legal situations and try to resolve problems prior to them getting that bad."  *Id.* at 34(132).  Indeed, as the Majority Opinion emphasizes, Williams was very insistent about this:  he said, "I mean you don't go to a doctor to get leukemia.  We're the people that's [sic] supposed to keep lawsuits from happening."  Maj. Op. at 46.

But despite Ledbetter's supposed *repeated* confessions throughout November and December to Williams that Gogel and Tyler were soliciting her to sue the

---

[16] These statements come from Williams's deposition, which was taken on August 20, 2015, four-and-a-half years after the purported events Williams described.  *See* ECF No. 123 at 50(193-95), 52(202).  But when we look at the notes Webb took of the January 5, 2011, meeting with Williams, they do not state that Williams reported that Ledbetter had told him that Gogel was the leader or a catalyst for Ledbetter's decision to file an EEOC charge.  *See* ECF No. 123 at 153.  Rather, they say that ***Williams*** "felt that [Gogel] was the catalyst for the trio of charges."  *Id.*

147

company, ECF No. 123 at 151 ¶¶ 28, 29; *id.* at 153, and despite his own supposed observations of Gogel, Tyler, and Ledbetter inexplicably meeting frequently during this same period, Williams ignored his self-stated job responsibilities for two months—until January 2011—before filling his "close" friend Jackson in on the news.

A reasonable jury could easily conclude that Williams's version of events— one where Williams ignored the very job responsibilities that Gogel was fired for supposedly ignoring—was suspect. The story becomes all the more so when we consider Williams's and Grimes's relationship with Jackson and their subsequent promotions.

Besides all this, when Jackson asked Gogel whether she had colluded with Ledbetter, Gogel expressly denied having done so. In fact, she provided documents from the meetings where she was accused of having conspired with Ledbetter, showing that she met with Ledbetter for work-related reasons. And Gogel offered innocent explanations for all the conduct that Jackson asked her about. If Jackson had any interest in performing a *bona fide* investigation, there were several other members of Team Relations that Jackson apparently did not socialize with whom he could have asked about Gogel. He didn't.

Instead, claiming to rely on his buddies' stories, Jackson decided to go ahead and put Gogel on administrative leave pending her dismissal twelve days later.

148

Notably, in firing her, Jackson—who holds a juris doctor legal degree, ECF No. 120 at 6(17)—painstakingly wrote that "one could conclude that [Gogel] encouraged or even solicited the filing of [Ledbetter's discrimination] charge." Perhaps tellingly, he did not state that he or KMMG actually believed that Gogel had engaged in such activity. But "one could conclude" lots of things—including that "one's" buddies wanted promotions enough to help Jackson get rid of Gogel.

Strangely enough, Jackson also accused Gogel of failing to investigate claims of discrimination that were made to her. For example, on the form entitled Employer's Information on Discharge for Failure to Obey Orders, Rules or Instructions or Failure to Perform the Duties for Which Hired, Jackson answered the question, "Explain in detail the effect the employee's actions had on your business," with, in its entirety, "Exposed KMMG to potential liability by failing to properly investigate claims and failure to properly record efforts to investigate/resolve problems." ECF No. 120 at 141.

A reasonable jury might not miss the irony in Jackson's accusation, given that the record (when viewed in the light most favorable to Gogel) shows that Gogel took numerous reports of discrimination to Jackson seeking remedy, and he is the one who did nothing, or worse. Indeed, Jackson went so far as to forbid Gogel from investigating the alleged relationship between Kia's president and a subordinate, even though such a relationship would violate KMMG's antiharassment provision.

149

So a jury could conclude that, conveniently for Jackson and KMMG, they got rid of an employee who complained about discrimination while simultaneously creating a scapegoat for their own refusal to address the company's rampant and institutionalized sex discrimination.

In short, there is enough evidence on this record from which a reasonable jury could find that when Jackson claimed to fire Gogel because she allegedly instructed Ledbetter to file an EEOC charge against KMMG, he did not really believe that she had done so. Instead, a reasonable jury could conclude that Jackson, Williams, and Grimes worked together to doctor up the charge as a pretext for retaliating against Gogel for exercising her Title VII participation and opposition rights. Because the record supports that reasonable inference, we may not, as the Majority Opinion does, ignore it and just take Jackson's story at face value.

## IV.

Either way we look at it—under our binding case law or under the Majority Opinion's retcon interpretation of it—this record, when viewed in the light most favorable to Gogel, establishes a material issue of fact that requires denial of summary judgment. For these reasons, I respectfully dissent.

150